[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 148.]

THE STATE OF OHIO, APPELLEE, *v.* BROOKS, APPELLANT.

[Cite as *State v. Brooks*, 1996-Ohio-134.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-1871—Submitted July 26, 1995—Decided March 4, 1996.)

APPEAL from the Court of Appeals for Summit County, No. C.A. 16192.

_____

{¶ 1} On August 26, 1992, defendant-appellant Antonio Brooks, accompanied by several other men, left Detroit, Michigan with the intent to sell drugs in Akron, Ohio. They departed Detroit in two cars at approximately 9:00 p.m. and arrived in Akron at about 1:15 a.m. on August 27. One of the men who traveled to Akron with Brooks was Collin Boatright ("Rabbit").

{¶ 2} Upon arriving in Akron, some of the men established a base of operations at the apartment of Toni Massingill. Toni's brother, Vernon Massingill ("Buster"), and Buster's girlfriend also lived in Toni's apartment. Brooks and Rabbit stayed at Toni's apartment after the other men left. Toni agreed to allow Rabbit and Brooks to sell drugs from her apartment in exchange for $40 to $50 per day plus a quantity of free drugs.

{¶ 3} While Rabbit sold the drugs, Brooks's role was to keep track of the money and to act as a lookout. Between 4:30 and 5:00 a.m. on August 27, Brooks and Rabbit purchased a .38 caliber revolver from a man identified only as Byron. Later, the two men obtained a box of bullets for the gun.

{¶ 4} That evening, Rabbit was relaxing in the ground floor apartment of April Griffin, who lived close by Toni Massingill, at 695 Westerly. Victoria Wilson and Sheeba Mosley were also in the apartment, and they were later joined by Brooks.

{¶ 5} At about 3:15 a.m. on August 28, Emanuel McMillan arrived at the apartment. McMillan, who was dating Mosley, had come in a taxi in order to take Mosley and her young child home. Rabbit and McMillan became embroiled in an argument, and Rabbit followed McMillan when he left the apartment. The argument continued outside, and in the midst of it, Rabbit shot McMillan once in the chest. McMillan was able to stagger into the waiting taxi, and the driver sped the wounded McMillan to a nearby hospital. Along the way, the taxi driver notified his dispatcher and a passing police officer of the shooting.

{¶ 6} Before fleeing, Rabbit told Brooks to kill the witnesses to the shooting. Brooks went to Toni's apartment, retrieved the box of bullets, and loaded the .38 caliber revolver. Brooks told Toni, "I am getting ready to kill the bitches." Brooks then returned to Griffin's apartment and proceeded to shoot Griffin, Wilson, and Mosley.

{¶ 7} After leaving the apartment, Brooks gave the murder weapon to Buster and told him to dispose of it. Brooks then walked back to Toni's apartment and said, "I just killed them bitches. Y'all ain't got nothing to worry about." Afterwards, Brooks went to the residence of April Woods, who also lived at 695 Westerly, in a second floor apartment.

{¶ 8} At approximately 3:30 a.m., Sergeant Robert Bennett of the Akron Police Department arrived at the scene and entered Griffin's apartment. There, he found Wilson and Mosley dead in the living room and Griffin dead in a bedroom. He also found five children alive, ranging from twenty months to five years of age. Each of the three victims had suffered a gunshot wound to the head, and Griffin had also suffered gunshot wounds to her hand, arm, and chest. One of the children was lying awake next to Griffin's body in the bedroom.

{¶ 9} When police backup units arrived, they secured the area. The police had a description of the shooter's clothes: black, knee-length shorts and a black

2

jacket with a distinctive emblem bearing the words "Public Enemy." The police also received information that the gunman might be in April Woods's apartment.

{¶ 10} Police found Brooks and a pair of black, knee-length shorts in Woods's apartment. On the landing outside of Woods's apartment, another officer found the distinctive "Public Enemy" jacket. Brooks carried no identification and originally gave police a false name when they asked his identity. As a result, police asked Brooks to accompany them to the station to determine his identity and to question him about the shootings.

{¶ 11} Buster was also taken in for questioning. Based on information provided by Buster, the police found the .38 caliber revolver, five empty .38 caliber shells, and a box of unused .38 caliber bullets. Forensic experts subsequently matched the empty shells to the revolver and also verified that the gun had fired several bullets recovered from the victims' bodies. Later in the day, Brooks waived his Miranda rights and gave a complete taped confession to the murders of Griffin, Wilson, and Mosley.

{¶ 12} On September 11, 1992, Brooks was charged with three counts of aggravated murder pursuant to R.C. 2903.01(A). Each aggravated murder count included two death penalty specifications. The first specification alleged multiple murders as a course of conduct in violation of R.C. 2929.04(A)(5), while the second death specification alleged that the murder victim "was purposely killed to prevent testimony" in a criminal proceeding in violation of R.C. 2929.04(A)(8). On January 11, 1993, Brooks proceeded to a jury trial. During the guilt phase, Brooks denied ever shooting anyone. He testified that Buster agreed to shoot the women after Rabbit had given Buster the gun and told Buster, "Do what you got to do." Despite Brooks's testimony, on January 23, 1993, the jury convicted Brooks as charged on all three aggravated murder counts with death penalty specifications.

Sentencing Phase Evidence

{¶ 13} Brooks was born on April 27, 1973. In an unsworn statement, Brooks described his troubled childhood. His mother was only thirteen years old when Brooks was born. She was a drug addict who supported her habit by stealing. Whenever Brooks's mother became upset, she beat him with belts, broomsticks, and extension cords. Brooks went to a variety of schools when he was young because his mother moved frequently. At age twelve, Brooks first learned that his father was alive and that Brooks had twelve brothers and six sisters. Brooks left home at age thirteen and lived at various times with relatives, his girlfriend, or alone. He joined a gang, quit school, and supported himself by working for a restaurant and by selling marijuana.

{¶ 14} Psychologist Dr. John Graham testified that Brooks had a personality disorder with antisocial, passive/aggressive, and paranoid characteristics. His unstable and negative upbringing helped form this disorder. As a result of his personality disorder, Brooks had terrible judgment, a poorly developed conscience, and disregard for social standards and values, and did not accept responsibility for his own acts. Yet Brooks, of low average intelligence, understood right from wrong, exhibited no confused thinking or gross distortion of reality, and displayed no psychotic symptoms.

{¶ 15} In its instructions to the jury at the conclusion of the sentencing phase of the trial, the court stated: "You are now required to determine unanimously that the death penalty is inappropriate before you can consider a life sentence." The jury charge, therefore, indicated that the jury could consider life imprisonment only if there was unanimity in determining that Brooks should not be sentenced to death.

{¶ 16} The trial court held the mitigation hearing on February 9, 1993. On the same day, after considering the evidence, the jury recommended the death penalty on all three aggravated murder counts. The trial court agreed and sentenced

4

Brooks to death on each murder count. The court of appeals affirmed Brooks's convictions and death penalty.

{¶ 17} The cause is now before this court upon an appeal as of right.

_____

*Maureen O'Connor,* Summit County Prosecuting Attorney, and *William D. Wellemeyer*, Assistant Prosecuting Attorney, for appellee.

*Annette L. Powers* and *Irving B. Sugerman*, for appellant.

_____

**PFEIFER, J.**

{¶ 18} Appellant has raised eighteen propositions of law. We have reviewed each and have determined that none justifies the reversal of appellant's convictions for aggravated murder. However, appellant's proposition of law regarding faulty jury instructions in the sentencing phase does have merit.

{¶ 19} Particularly, the trial judge's instruction that the jury was required to determine unanimously that the death penalty was inappropriate before it could consider a life sentence was plain error. We therefore affirm appellant's convictions but reverse the sentence of death.

Evidentiary Issues

{¶ 20} Appellant's propositions of law four, five, six, nine and ten raise evidentiary issues. In proposition four, Brooks argues that prejudicial hearsay was admitted over objection. At trial, the first police officer at the scene, Bennett, described finding a child next to Griffin's body. Bennett testified that the child stated, "They hurt my mommy," and that the child put his finger into the victim's nose and head wound.

{¶ 21} The child's statement was not hearsay because it was not offered to prove the truth of the matter asserted. Bennett was merely describing the circumstances of how he discovered Griffin's slain body. The child's statement

was not offered to prove that Griffin had been injured, but was a part of Bennett's description of the crime scene. Thus, proposition four lacks merit.

{¶ 22} In his fifth proposition of law, Brooks argues that the trial court abused its discretion by refusing to permit Brooks to cross-examine Buster Massingill about the fact that Buster had originally been charged with complicity in the murders. As appellant points out, Evid.R. 609 is not relevant. Evid.R. 609 deals only with evidence of criminal *convictions*. In this case, Buster was never convicted of complicity. Appellant argues that the cross-examination should have been allowed under Evid.R. 608(B). Evid.R. 608(B) vests a trial court with discretion to allow cross-examination about specific instances of conduct of a witness "if clearly probative of truthfulness or untruthfulness." The rule reads, in part:

"Specific instances of the *conduct* of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of a crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, *in the discretion of the court*, *if clearly probative of truthfulness or untruthfulness*, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness   * * * ." (Emphasis added.)

{¶ 23} The fact that police originally charged Buster with complicity was not probative of Buster's truthfulness and is not conduct by Buster. Evid.R. 608 therefore is not relevant. However, the cross-examination should have been allowed under Evid.R. 616, which reads:

"Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

{¶ 24} Although the original charge of complicity was not evidence of Buster's character for truthfulness, it was evidence of a motive for him to be

6

untruthful and attempt to foist blame onto appellant. Still, the error in denying the cross-examination was harmless for the following reasons.

**{¶ 25}** The jury was privy to a bevy of examples of conduct probative of Buster's truthfulness. The trial court allowed Brooks free rein to cross-examine Buster about all aspects of his involvement with Rabbit, Brooks, and the murders. Brooks cross-examined Buster about his use of drugs, his hiding or losing the murder weapon, the shells, and the bullets, and all his conversations with police. The jury knew that Buster, with three burglary convictions, was on parole when the murders occurred. The jury also knew that Buster, indicted for tampering with evidence and obstruction of justice in the murders, had pled guilty and was in prison for tampering. The jury knew that Buster had plea-bargained and agreed to testify against Brooks. In short, the jury had concrete examples of Buster's truthfulness, or lack thereof, and also knew of the motivations which might have influenced his testimony. Proposition five thus lacks merit.

**{¶ 26}** In his sixth proposition of law, Brooks challenges the admission of certain brief portions of his taped confession. The transcript of the confession heard by the jury reads as follows:

"Q. You don't really show much remorse here, is there a reason for that, what do you think wrong place, wrong time or are you just protecting yourself?

"A. (inaudible)

"Q. How do you feel about killing those three girls?

"A. Real bad, I just did it to protect myself.

"Q. Do you belong to any organized gangs, street gangs?

"A. Yeah.

"Q. What gang is that?

"A. Gangster Disciples, it's a Chicago based gang.

"Q Chicago based gang, Gangster Disciples, do they have a group in Detroit?

"A. No.

"Q. This is just a gang that you belong to?

"A. Yes.

"Q. Anything else you can think of, Sgt. Hammond?

"Q. Have you ever killed anyone before?

"A. No, sir.

"Q. Have you ever been in jail?

"A. On Drugs."

{¶ 27} As to most of this material, Brooks did not object at trial and waived all but plain error. Brooks only objected to the detective's remark that Brooks did not show remorse. The trial court did not order the detective's remark deleted because it would be "kind of hard" to edit the tape. Inconvenience, however, is not a sufficient reason to allow inadmissible evidence to go to the jury. Nevertheless, the detective's offhand remark did not materially prejudice Brooks. We find the error in admitting it to be harmless.

{¶ 28} As to the other statements and comments, neither plain error nor material prejudice resulted. By the time the confession was played, the jury was well aware of Brooks's criminal past. In his counsel's opening statement in the trial's guilt phase, Brooks admitted that at age fourteen, he "got associated with gangs" as "a way of self-protection." As a result, his life "was filled with violence, street violence, fights." He supported himself in part by selling marijuana. His way of life was to "live on the street, deal drugs, make ends meet." In his testimony, Brooks elaborated on his background and admitted that he had come to Akron to sell cocaine. Thus, Brooks now objects to parts of the taped confession that mirrored his trial strategy and evidence. We reject Brooks's sixth proposition of law.

{¶ 29} In his ninth proposition of law, Brooks argues that the trial court erred in admitting, over objection, four gruesome photographs. Three crime scene

photographs each depict a victim's head and gunshot wound, although in two photographs the wound is obscured. A coroner's slide depicts Griffin's head and torso injuries.

{¶ 30} Pursuant to Evid.R. 403 the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710, 726; *State v. Maurer* (1984) 15 Ohio St.3d 239, 5 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273.

{¶ 31} The two challenged photographs of Griffin are cumulative to each other. Error in admitting them, however, was harmless. Otherwise, the trial court did not abuse its discretion in regard to the photographs. The photos are not inflammatory. Each crime scene photograph illustrates the testimony of police officers and has probative value in showing the injury and the killer's intention. See *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542, 551. The slide illustrates the coroner's testimony, shows Griffin's head and torso injuries, and demonstrates the killer's intention. No prejudicial error occurred. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 602, 605 N.E.2d 916, 923; *State v. Franklin* (1991), 62 Ohio St.3d 118, 125, 580 N.E.2d 1, 7.

{¶ 32} In his tenth proposition, Brooks argues that his confession was involuntary. A court, in determining whether a confession is involuntary, "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus; see, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 57, 549 N.E.2d 491, 499.

{¶ 33} Here, the evidence supports the trial court's finding that the confession was voluntary. During a pretrial suppression hearing, two police

officers testified that the confession was voluntary, and Brooks presented no evidence. At trial, Brooks testified that he had confessed because police told him that if he did so, he would get just fifteen to eighteen years and would be on parole in six or seven years. No other evidence supports that claim. At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact. See *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584.

{¶ 34} The evidence in this case supports the trial court's finding that the confession was voluntary. Police took Brooks into custody at around 6:30 a.m., and he remained in custody for approximately ten hours before he confessed. Until midafternoon, police did not question him at the station except as to his identity and to secure his consent to an atomic absorption test of his hands. Brooks claims that he was not fed prior to his confession, but a police officer testified that he brought Brooks a tuna sandwich and a cola at around 1:00 p.m. Brooks told the officer that he did not like tuna. Brooks testified at trial that he had told the officer that he was a vegetarian and allergic to tuna. Still, there is no evidence that Brooks asked for other food, or suffered deprivation, mistreatment, or threats.

{¶ 35} By 3:30 p.m., having interviewed Buster and others, police strongly suspected Brooks and then questioned him. Before doing so, police advised Brooks of his *Miranda* rights, and he waived those rights and agreed to talk. Brooks initially denied some or all of the murders, but when confronted with the evidence, he confessed to all. Around 4:40 p.m., police readvised him of his rights and secured a taped confession. After the confession, he also told a detective, "It was kill or be killed."

{¶ 36} Early on in his taped confession, when being asked whether promises, threats, pressure, or coercion had been used against him to secure the confession, Brooks stated that he did not understand what the word "coercion" meant. A detective explained that it meant that Brooks was not being forced into

10

the confession. Simply because Brooks was unsure of the definition of "coercion" does not mean that the confession was involuntary. In fact, Brooks said he understood and waived his rights. The tape confirmed this. The police interviewed him for less than two hours, and Brooks appeared to be in full control of his mental faculties. He did not appear to be under the influence of alcohol or drugs, the police were not overzealous, and Brooks completely understood what he was doing. We thus reject Brooks's tenth proposition of law.

## Constitutionality

{¶ 37} In his seventh proposition of law, Brooks argues that R.C. 2929.04(A)(5) and R.C. 2929.04(A)(8), which make killing two or more persons and killing witnesses to a crime death penalty offenses, are unconstitutionally vague and overbroad. To challenge a statute, the challenger must overcome a strong presumption of constitutionality. *State v. Warner* (1990), 55 Ohio St.3d 31, 43, 564 N.E.2d 18, 30-31. Overbreadth claims relate only to First Amendment issues, absent here. *New York v. Ferber* (1982), 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113. This court has already determined that "R.C. 2929.04(A)(5) is not void for vagueness under either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution." *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, syllabus.

{¶ 38} Similarly, R.C. 2929.04(A)(8) clearly defines the situations to which it applies. It states one of the eight situations in which the death penalty is allowed:

"The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for his testimony in any criminal proceeding."

**{¶ 39}** The statute's applicability is sharply defined to include aggravated murders committed to silence a witness to a crime or in retaliation for testimony. The language of R.C. 2929.04(A)(8) "is definitive and is circumscribed to cover only those situations which it fairly describes." *Benner*, *supra*, 40 Ohio St.3d at 305, 533 N.E.2d at 707. Brooks's seventh proposition of law thus lacks merit.

**{¶ 40}** Brooks's eighth, thirteenth and fourteenth propositions of law also raise constitutionality arguments. Since this court previously has considered and decided the issues raised in those propositions of law, we summarily reject them. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

Jury Issues

**{¶ 41}** Brooks argues in his eleventh proposition of law that the trial court erred when it overruled his motion to prohibit the use of peremptory challenges to exclude jurors who expressed concerns about capital punishment. In *State v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192, this court held that the use of peremptory strikes against prospective jurors opposed to the death penalty was proper. Apart from excluding jurors based on race or gender, prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control. *State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419. We therefore reject Brooks's eleventh proposition of law.

**{¶ 42}** In his twelfth proposition of law, Brooks argues that the trial court erred in allowing individual voir dire only of those jurors who expressed reservations about the death penalty. After preliminary questions and instructions, the court divided potential jurors into groups of five, six or seven. The court and counsel then questioned the members of each subgroup regarding their death penalty views and whether they were exposed to any pretrial publicity. Those potential jurors who expressed reservations about the death penalty or who indicated a familiarity with the facts of the case were later individually questioned

12

by counsel. Finally, all the potential jurors were called as one group to answer the court's and counsel's more general questions.

{¶ 43} At trial, Brooks did not object to the trial court's voir dire procedure, and thus waived the issue but for plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. No plain error exists. Also, the trial court did not abuse its discretion. "Determination of issues raised in voir dire in criminal cases has long been held to be within the discretion of the trial judge." *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285. The trial judge also has the discretion to determine "whether a voir dire in a capital case should be conducted in sequestration." *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph two of the syllabus.

{¶ 44} No basis exists to find that the trial judge abused his discretion. Nothing suggests that the procedure affected the trial result or materially prejudiced Brooks. We accordingly reject Brooks's twelfth proposition of law.

Effective Assistance of Counsel

{¶ 45} In his fifteenth proposition of law, Brooks argues that the trial court erred in appointing his original counsel to represent him on appeal without first securing a waiver from Brooks of any issues of ineffective assistance of counsel. First, whether that is even the job of the court, rather than Brooks's lawyer, is debatable. Second, Brooks cannot demonstrate that any prejudice resulted from the trial court's not instructing him that he had a right to different appellate counsel, since he now has different counsel, and because this court will consider all of the claimed ineffective-assistance issues his counsel did not raise before the court of appeals.

{¶ 46} Brooks does raise those issues here in his sixteenth proposition of law, asserting that his counsel's performance was deficient in four primary instances in the penalty phase of the trial. Reversal of a conviction on the basis of ineffective assistance of counsel requires that the defendant show that counsel's

performance was deficient and that the deficient performance prejudiced the defense, that is, deprived the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 47} Brooks claims that counsel's first error was to allow Brooks to take the stand for an unsworn statement in the mitigation phase of the trial. Actually, Brooks, not counsel, had the choice whether to testify or give an unsworn statement. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 27, 553 N.E.2d 576, 583. In any event, the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury. By giving an unsworn statement, a defendant trades immunity from cross-examination for a limiting jury instruction. While subject to debate, that decision largely is a matter of style, and is a tactical decision that does not form the basis for a claim of ineffective assistance.

{¶ 48} Brooks next claims that his counsel erred in permitting an expert witness to testify in mitigation. Counsel's choice to call the psychologist, Dr. John Graham, as a witness also fit within the "wide range of reasonable professional assistance." *Strickland*, *supra*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Graham confirmed that the deprived upbringing of Brooks had caused his personality disorder, which supported a legitimate mitigation strategy. Graham never blamed Brooks's personality defect on Brooks himself, but rather saw it as a natural outgrowth of the way he had been raised. Counsel, with little to work with, did the best he could under the circumstances to present mitigating factors for the jury's consideration. See *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754, 762-763.

{¶ 49} Brooks also claims that counsel erred by failing to argue residual doubt in mitigation. Again, this is a tactical matter that deserves wide latitude. The merits of arguing residual doubt to a jury which has just unanimously determined

14

that a defendant has committed the crime beyond a reasonable doubt are dubious. When arguing for mercy for a client based upon a terrible upbringing, it was probably best for Brooks's counsel to avoid issues that could offend or alienate jurors.

{¶ 50} Finally, Brooks argues that his counsel erred by failing to object to a comment made by the prosecutor in closing argument. In his closing, the prosecutor asked the jury to consider the effect of the murders on the children and families of the victims. Brooks points out that no evidence was presented regarding the effect of the murder on the victims' families and argues that the prosecutor's comments were designed to arouse passion and prejudice against Brooks. However, the jury had already heard the worst, that the victims' children were present when they were killed, so hearing the prosecutor's talk of the victims' families could hardly have been inflammatory. Also, counsel may well have thought that objecting might unduly emphasize the brief remarks or that the jury might find him, and by extension Brooks, unfeeling.

{¶ 51} We find that none of Brooks's counsel's alleged deficiencies made any difference in the outcome of the case. Brooks did not demonstrate "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, *supra*, 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph three of the syllabus. Brooks's sixteenth proposition of law thus lacks merit.

Prosecutorial Misconduct

{¶ 52} In part of his first and in his seventeenth proposition of law, Brooks argues that the prosecutor engaged in misconduct by asking the jury to consider the children and families of the victims and the effect of the murders on them in deciding the punishment, when no evidence supported this argument. Brooks did not object, and no prejudicial error occurred.

{¶ 53} "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87. We find that the prosecutor's argument that the jury consider the victims' families was misconduct, but harmless. See *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. Also, the prosecutor's comment did not infringe any constitutional rights against victim impact evidence. *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720; *State v. Evans* (1992), 63 Ohio St.3d 231, 238, 586 N.E.2d 1042, 1050. We therefore reject the seventeenth proposition of law and the relevant part of the first proposition of law.

Amendment of Indictment

{¶ 54} In his third proposition of law, Brooks argues that the trial court erred by allowing at trial an amendment to the indictment. After the jury retired to deliberate on guilt, the parties noted a defect in the R.C. 2929.04(A)(8) death penalty specification common to each aggravated murder count. The specification charged that Brooks had "committed the offense of aggravated murder as a part of a course of conduct in which the victim of the aggravated murder was a witness to an offense who was purposely killed to prevent testimony in any criminal proceeding."

{¶ 55} The deficiency was the omission of the language narrowing the offense so as to exclude the murder of a witness killed at the same time the witness observed an offense. Thus, the court amended the indictment's language to conform to R.C. 2929.04(A)(8). The trial court added to each (A)(8) specification the further words "and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness."

{¶ 56} When the amendment was offered, defense counsel said he did not know whether to object or not, so he simply asked the record to reflect what

occurred. The record so reflects. The court's verdict forms and final instructions, given without objection, conformed to the amendment. Arguably, the failure of Brooks to object to the indictment before trial, or even enter a precise objection at trial, waived the issue. Crim.R. 12(B)(2) and (G).

{¶ 57} Also, under Crim.R. 7(D), the court "may at any time before, during, or after a trial amend the indictment * * *, provided no change is made in the name or identity of the crime charged." See, also, R.C. 2941.30. In *State v. O'Brien* (1987), 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144, at paragraph two of the syllabus, the court recognized that an indictment could be amended to include a missing element of the offense "if the name or the identity of the crime is not changed, and the accused has not been misled or prejudiced by the omission of such element from the indictment."

{¶ 58} In this case, the amendment did not expand, but rather narrowed, the death penalty specification. The amendment did not change the specification's name, identity, nature, or the applicable code section. Brooks was neither misled nor prejudiced by the original inadvertent omission of this narrowing language from the indictment. Thus, under Crim.R. 7(D) and *State v. O'Brien*, proposition three lacks merit.

Sentencing Phase Jury Instructions

{¶ 59} In its sentencing phase jury instructions, the trial court instructed the jury as follows: "You are now required to determine unanimously that the death penalty is inappropriate before you can consider a life sentence." The instruction was plainly incorrect and contrary to R.C. 2929.03(D)(2), which provides:

"If the jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole

eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment."

{¶ 60} R.C. 2929.03(D)(2) contains no limiting language as to when a jury may contemplate a life sentence. The jury instruction given by the trial court would require unanimity that the death penalty was inappropriate before the jury could even *consider* a life sentence. Instead of requiring the unanimity of a death sentence, this instruction required the jury to issue a death sentence unless each juror was convinced that the death penalty was inappropriate.

{¶ 61} The instruction is also contrary to the rationale of this court's holding in *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, which allows jurors to consider a lesser included offense without first unanimously determining that the defendant is not guilty of the more serious charge. This court wrote:

"If a jury is unable to agree unanimously that a defendant is guilty of a particular offense, it may proceed to consider a lesser included offense upon which evidence has been presented. The jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense." *Id.*

{¶ 62} Analogously, the jury in this case did not have to rule out the death penalty unanimously before considering a life sentence. Unfortunately, they were instructed exactly otherwise.

{¶ 63} The faulty jury instruction was error. Brooks's counsel did not object to that error at trial. That failure to object, however, does not constitute a waiver in this case. As this court held in *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus:

"A party does not waive his objections to the court's charge by failing to formally object thereto (1) where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and

(2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the trial court's charge to the jury. (Crim.R. 30[A], construed.)"

**{¶ 64}** The record reflects that Brooks's counsel requested a proper jury instruction before the judge read the faulty one. The requested instruction read: "You are *not* required to determine unanimously that the death sentence is inappropriate before you consider the life sentences." (Emphasis added.) Thus, pursuant to Wolons, counsel did not waive his objection by failing to object after the instruction was given. The question remains as to whether the error deprived Brooks of a fair trial.

**{¶ 65}** In *Mills v. Maryland* (1988), 486 U.S. 367, 376-377, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384, 395, the United States Supreme Court held that jury instructions that prevent one or more jurors from giving due consideration to "factors which may call for a less severe penalty" than death violate the Eighth Amendment prohibition against "cruel and unusual punishment." Determining that the jury instructions in that case had created a risk of "erroneous imposition of the death sentence," the court vacated the sentence of death. Id. at 375, 108 S.Ct. at 1866, 100 L.Ed.2d at 394.

**{¶ 66}** In *Kubat v. Thieret* (C.A.7, 1989), 867 F.2d 351, the court, applying *Mills*, found that jury instructions similar to those used in the present case violated the Eighth and Fourteenth Amendments and vacated the defendant's death sentence. *Kubat* involved Illinois's death penalty statute, which explicitly provides that the death penalty cannot be imposed if one or more jurors believes that there are mitigating factors sufficient to preclude the death penalty. The trial court in Kubat gave the following instruction, without objection: "If, after your deliberations, you unanimously conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment." *Id*. at 369.

**{¶ 67}** The *Kubat* court reasoned that even if one juror was confused by the jury instructions, the reliability of the verdict was undermined. If a juror believed his one vote could not affect the ultimate result, he might acquiesce in the death sentence. Since that possibility "risks erroneous imposition of the death sentence," *Mills*, *supra*, 486 U.S. at 375, 108 S.Ct. at 1866, 100 L.Ed.2d at 394, the court found that the jury instruction violated the Eighth and Fourteenth Amendments. *Kubat*, 867 F.2d at 373-374.

**{¶ 68}** In regard to the present case, R.C. 2929.03(D)(2) facially seems to require the jury to recommend a life sentence even if only one juror finds the death penalty inappropriate. There is some dispute in the case law, however, as to how much power a solitary juror has to nullify a death sentence. In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph ten of the syllabus, this court held that in returning a sentence of life imprisonment under R.C. 2929.03(D), the jury's verdict must be unanimous. In *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96, syllabus, this court held that "[w]hen a jury becomes irreconcilably deadlocked during its sentencing deliberations in the penalty phase of a capital murder trial and is unable to reach a unanimous verdict to recommend any sentence authorized by R.C. 2929.03(C)(2), the trial court is required to sentence the offender to life imprisonment * * *." Thus, practically speaking, a lone juror could prevent the imposition of the death penalty.

**{¶ 69}** *Jenkins* defines what the jury's job is—to render a unanimous verdict. *Springer* simply explains what a trial court must do if a jury is deadlocked, that is, when the jury does not properly do its job. We believe that *Jenkins* and *Stringer* may be harmonized, and made consistent with the policy behind R.C. 2929.03(D), through a jury instruction which requires the jury, when it cannot unanimously agree on a death sentence, to move on in their deliberations to a consideration of which life sentence is appropriate, with that determination to be

unanimous. That instruction would reflect the policy behind the statute noted by this court in *Springer*:

"We believe that the requirement of Ohio's death penalty statute that a life sentence be recommended and imposed under circumstances where the death penalty cannot be recommended or imposed represents a clear statement of policy that an offender be sentenced to a term of life imprisonment where the trial jury is unable to unanimously agree that the penalty of death is appropriate." *Springer*, 63 Ohio St. 3d at 172, 586 N.E.2d at 100.

**{¶ 70}** In Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed.

**{¶ 71}** We cannot know what was going on in the minds of the jurors when they were given the duty of deciding Brooks's fate, and we thus cannot say for certain whether one of the jurors would have been moved enough by the mitigating factors in Brooks's favor, his youth and harrowing childhood, to have recommended a life sentence. The record reflects that the jury in this case was instructed in a manner completely contrary to law, making it less likely for Brooks to benefit from the opinion of one juror that the death penalty was inappropriate. As the *Kubat* court noted, if a juror believed his one vote could not affect the ultimate result, he might acquiesce in the death sentence. In this case, the jury instruction undermined the reliability of the jury verdict and risked erroneous imposition of the death sentence, thereby materially prejudicing Brooks's right to a fair trial.

**{¶ 72}** We therefore affirm defendant's convictions for aggravated murder, but remand his case for resentencing consistent with this opinion.

*Judgment affirmed in part*

*and reversed in part,*

*and cause remanded.*

MOYER, C.J., WRIGHT, TYACK and GRADY, JJ., concur.

DOUGLAS and F.E. SWEENEY, JJ., concur in part and dissent in part.

G. GARY TYACK, J., of the Tenth Appellate District, sitting for RESNICK, J.

THOMAS J. GRADY, J., of the Second Appellate District, sitting for COOK, J.

————————————

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 73} I concur in the judgment of the majority affirming the judgment of the court of appeals which affirmed appellant's convictions. I dissent from the majority's judgment to reverse the court of appeals with regard to appellant's sentence of death. I believe that the judgment of the court of appeals, both as to conviction and the sentence of death as a penalty, was proper and should be affirmed.

F.E. SWEENEY, J., concurs in the foregoing opinion.

————————————