Justice Stevens,
concurring in part and concurring in the judgment.
In my judgment the Court of Appeals correctly concluded that two errors that occurred during Spisak’s trial violated clearly established federal law. First, the jury instructions impermissibly required that the jury unanimously reject a death sentence before considering other sentencing options. Second, the closing argument of Spisak’s counsel was so egregious that it was constitutionally deficient under any standard. Nevertheless, for the reasons set forth in Part III of the Court’s opinion, ante, at 151-155,1 agree that these errors did not prejudice Spisak and thus he is not entitled to relief.
I
The jury instructions given during Spisak’s penalty phase,. described in the Court’s opinion, ante, at 146-148, are fairly read to require the jury first to consider whether the death penalty is warranted — i. e., whether the aggravating factors outweigh the mitigating factors — before moving on to consider whether instead a lesser penalty — i. e., one of two avail *157 able life sentences — is appropriate. Consistent with Ohio law at the time of Spisak’s trial,[1] the jury was told that it must reach its decision unanimously. The jury was not instructed on the consequence of its failure to agree unanimously that Spisak should be sentenced to death. Spisak and the Court of Appeals both described these instructions as “acquittal first” because they would have led a reasonable jury to believe that it first had to “acquit” the defendant of death — unanimously—before it could give effect to a lesser penalty.
Following its prior decision in Davis v. Mitchell, 318 F. 3d 682 (CA6 2003), in which it struck down “virtually identical” jury instructions, Spisak v. Mitchell, 465 F. 3d 684, 710 (CA6 2006), the Court of Appeals concluded that the instructions given during Spisak’s penalty phase were impermissible because they “require[d] the jury to unanimously reject a death sentence before considering other sentencing alternatives,” id., at 709. In Davis, the court had explained that an instruction that requires a capital jury to “first unanimously reject the death penalty before it can consider a life sentence ... precludes the individual jury from giving effect to mitigating evidence ...." 318 F. 3d, at 689. The source *158 of this constitutional infirmity, the court decided, was our decision in Mills v. Maryland, 486 U. S. 367 (1988). For the reasons cogently examined in the Court’s opinion, ante, at 145-149, I agree that Mills does not clearly establish that the instructions at issue were unconstitutional. But, in my view, our decision in Beck v. Alabama, 447 U. S. 625 (1980), does.[2]
In Beck, we held that the death penalty may not be imposed “when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict.” Id., at 627 (internal quotation marks omitted). At that time, the Alabama death penalty statute had been “consistently construed to preclude any lesser included offense instructions in capital eases.” Id., at 629, n. 3. Thus, the Alabama jury was “given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime.” Id., at 628-629. Because of the unique features of Alabama’s capital punishment system,[3] Beck’s jury believed that either it had to convict Beck, thus sending him to his death, or acquit him, thus setting him free. The jury was not presented with the “third option” of convicting him of a noncapital offense, thus ensuring that he would receive a substantial *159 punishment but not receive the death penalty. Id., at 642. We concluded that the false choice before the jury — death or acquit — “introduce[d] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.” Id., at 643. In other words,
“the difficulty with the Alabama statute is that it interjects irrelevant considerations into the factfinding process, diverting the jury’s attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. Thus, on the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason — its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason — that, whatever his crime, the defendant does not deserve death.” Id., at 642-643.
Although Beck dealt with guilt-phase instructions, the reach of its holding is not so limited. The “third option” we discussed in Beck was, plainly, a life sentence. Moreover, the unusual features of the Alabama capital sentencing scheme collapsed the guilt and penalty phases before the jury (but not before the judge). Our concern in Beck was that presenting the jury with only two options — death or no punishment — introduced a risk of arbitrariness and error into the deliberative process that the Constitution could not abide in the capital context. See Spaziano v. Florida, 468 U. S. 447, 455 (1984) (“The goal of the Beck rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence”). We held, therefore, that the jury must be given a meaningful opportu *160 nity to consider and embrace the equivalent of a life sentence when the evidence supports such an option.
The acquittal-first jury instructions used during Spisak’s penalty phase interposed before the jury the same false choice that our holding in Beck prohibits. By requiring Spisak’s jury to decide first whether the State had met its burden with respect to the death sentence, and to reach that decision unanimously, the instructions deprived the jury of a meaningful opportunity to consider the third option that was before it, namely, a life sentence. Indeed, these instructions are every bit as pernicious as those at issue in Beck because they would have led individual jurors (falsely) to believe that their failure to agree might have resulted in a new trial and that, in any event, they could not give effect to their determination that a life sentence was appropriate unless and until they had first convinced each of their peers on the jury to reject the death sentence.
Admittedly, Spisak has never identified Beck as the source of the constitutional infirmity at issue in this case, nor did the courts below cite or rely upon it. But Spisak has consistently pressed his argument in terms that are wholly consistent with Beck. On direct appeal he contended, for example, that he
“was severely prejudiced by the erroneous jury forms because the jurors were never informed of what would happen if they were unable to reach a unanimous decision. That may have led to irreparable speculation that if they failed to agree, Frank Spisak would be freed or have a new trial or sentencing hearing. Such improper speculation may have led those not in agreement with death to go along with a majority. The jury should have been instructed that if they were unable to unanimously agree to death they must return a verdict of one of the life sentences or in the alternative, the court would impose a life sentence.” Exh. 28D, 16 Record 391 (Merit Brief of Appellant).
*161 The untenable choice Spisak describes is perfectly analogous to the quandary, discussed above, that we described in Beck. See also 447 U. S., at 644 (“It is extremely doubtful that juries will understand the full implications of a mistrial or will have any confidence that their choice of the mistrial option will ultimately lead to the right result. Thus, they could have no assurance that a second trial would end in the conviction of the defendant on a lesser included offense” (footnote omitted)). Spisak and the Court of Appeals both correctly assailed the jury instructions at issue in this case, but in my view Beck provides the proper basis in clearly established federal law to conclude the instructions were unconstitutional.
II
Petitioner defends Spisak’s counsel’s closing argument as a reasonable strategic decision “to draw the sting out of the prosecution’s argument and gain credibility with the jury by conceding the weaknesses of his own case.” Brief for Petitioner 37. I agree that such a strategy is generally a reasonable one and, indeed, was a reasonable strategy under the difficult circumstances of this case. Even Spisak concedes that his counsel “faced an admittedly difficult case in closing argument in the penalty phase.” Brief for Respondent 43. But, surely, a strategy can be executed so poorly as to render even the most reasonable of trial tactics constitutionally deficient under Strickland v. Washington, 466 U. S. 668 (1984). And this is such a case.
It is difficult to convey how thoroughly egregious counsel’s closing argument was without reproducing it in its entirety. The Court’s assessment of the closing as “lengthy and rambling” and its brief description of its content, see ante, at 150, does not accurately capture the catastrophe of counsel’s failed strategy. Suffice it to say that the argument shares far more in common with a prosecutor’s closing than with a criminal defense attorney’s. Indeed, the argument was so outrageous that it would have rightly subjected a prosecutor *162 to charges of misconduct. See Brief for Steven Lubet et al. as Amici Curiae 15-16 (observing that counsel’s closing argument “would have been improper even coming from the prosecutor”). A few examples are in order.
Presumably to take the “sting” out of the prosecution’s case, Brief for Petitioner 37, counsel described his client’s acts in vivid detail to the jury:
“[Y]ou can smell almost the blood. You can smell, if you will, the urine. You are in a bathroom, and it is death, and you can smell the death ... and you can feel, the loneliness of that railroad platform . . . and we can all know the terror that [the victim] felt when he turned and looked into those thick glasses and looked into the muzzle of a gun that kept spitting out bullets . . . And we can see a relatively young man cut down with so many years to live, and we could remember his widow, and we certainly can remember looking at his children . . . There are too many family albums. There are too many family portraits dated 1982 that have too many empty spaces. And there is too much terror left in the hearts of those that we call lucky.”[4] Spisak v. Mitchell, 465 F. 3d, at 704-705 (internal quotation marks omitted).
Presumably to “gain credibility” with the jury, Brief for Petitioner 37, counsel argued that his client deserved no sympathy for his actions:
*163 “Sympathy, of course, is not part of your consideration. And even if it was, certainly, don’t look to him for sympathy, because he demands none. And, ladies and gentlemen, when you turn and look at Frank Spisak, don’t look for good deeds, because he has done none. Don’t look for good thoughts, because he has none. He is sick, he is twisted. He is demented, and he is never going to be any different.” 465 F. 3d, at 705 (internal quotation marks omitted).
And then the strategy really broke down: At no point did counsel endeavor to direct his negative statements about his client toward an express appeal for leniency.[5] On the contrary, counsel concluded by telling the jury that “whatever you do, we are going to be proud of you,” ibid, (internal quotation marks omitted), which I take to mean that, in counsel’s view, “either outcome, death or life, would be a valid conclusion,” ibid.
Spisak’s crimes, and the seemingly unmitigated hatred motivating their commission, were truly awful. But that does not excuse a lawyer’s duty to represent his client within the bounds of prevailing professional norms. The mere fact that counsel, laudably, may have had a “strategy” to build rapport with the jury and lessen the impact of the prosecution’s case does not excuse counsel’s utter failure to achieve either of these objectives through his closing argument. In short, counsel’s argument grossly transgressed the bounds of what constitutionally competent counsel would have done in a similar situation.
III
Notwithstanding these two serious constitutional errors, I agree with the Court that these errors do not entitle Spisak *164 to relief. As the Court’s discussion in Part III makes vividly clear, see ante, at 151-153, Spisak’s own conduct alienated and ostracized the jury, and his crimes were monstrous. In my judgment even the most skillful of closing arguments — even one befitting Clarence Darrow — would not have created a reasonable probability of a different outcome in this case. Similarly, in light of Spisak’s conduct before the jury and the gravity of the aggravating circumstances of the offense, the instructional error was also harmless because it did not have a substantial and injurious effect on this record, Brecht v. Abrahamson, 507 U. S. 619, 623 (1993).
Accordingly, I concur in the judgment and concur in the Court’s discussion of prejudice in Part III of its opinion.

 Ohio no longer uses the type of jury instructions at issue in this case. In 1996 the Ohio Supreme Court instructed that “[i]n Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed.” State v. Brooks, 75 Ohio St. 3d 148, 162, 661 N. E. 2d 1030, 1042. Although the Brooks decision signaled a change in Ohio’s capital jury instructions, it was not a change in state law: One juror had the power to prevent a death penalty recommendation before Brooks. See State v. Springer, 63 Ohio St. 3d 167, 172, 586 N. E. 2d 96, 100 (1992) (holding that an offender must be sentenced to life if the penalty-phase jury deadlocks). Thus, consistent with our view that “accurate sentencing information is an indispensable prerequisite to a [jury’s] determination of whether a defendant shall live or die,” Gregg v. Georgia, 428 U. S. 153, 190 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the Ohio high court laudably improved upon the accuracy of Ohio capital jury instructions in Brooks.

 Notably, Beck substantially predates Spisak’s trial and thus my application of Beck obviates any discussion on when federal law is established for Antiterrorism and Effective Death Penalty Act of 1996 purposes, see ante, at 143. Regardless, in accordance with the view I expressed in Williams v. Taylor, 529 U. S. 362, 379-380 (2000) (opinion of Stevens, J.), I would conclude that our decision in Mills, decided before Spisak’s conviction became final, is also available to him.

 Under Alabama law, the judge conducts a separate penalty-phase proceeding after the jury has returned a conviction on a capital offense. Beck, 447 U. S., at 629. Thus, the jury reasonably believed that its verdict would set the defendant’s punishment at death.

 To make matters worse, these graphic and emotionally charged descriptions of Spisak’s crimes were irrelevant under state law even for purposes of the State’s case for aggravating circumstances. See State v. Wogenstahl, 75 Ohio St. 3d 344, 356, 662 N. E. 2d 311, 322 (1996) (“[T]he nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation”)’, see also State v. Johnson, 24 Ohio St. 3d 87, 93, 494 N. E. 2d 1061, 1066 (1986) (explaining that statutory aggravating circumstances should be narrowly construed); Ohio Rev. Code Ann. § 2929.04(A) (Lexis 2006) (identifying 10 aggravating circumstances but not including heinous circumstances of offense).

 Counsel did attempt to appeal to the jury’s sense of humanity, perhaps implicitly suggesting that humane people do not condemn others, especially those with mental illness, to death. App. to Pet. for Cert. 339a-341a. But counsel never requested a life sentence on behalf of his client.