*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0254p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BRETT X. HARTMAN,

    *Petitioner-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

    *Respondent-Appellee.*

Nos. 04-4138/4185/4243

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-01336—James Gwin, District Judge.

Argued: January 31, 2007

Decided and Filed: July 10, 2007

Before: DAUGHTREY, CLAY, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David C. Stebbins, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** David C. Stebbins, Columbus, Ohio, Michael J. Benza, Cleveland, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

    GILMAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. CLAY, J. (pp. 21-28), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

    RONALD LEE GILMAN, Circuit Judge. Brett X. Hartman was convicted in an Ohio state court of aggravated murder and was sentenced to death. After exhausting his state-court remedies, he filed a petition for habeas corpus in federal district court. The district court denied his petition, but issued a certificate of appealability (COA) regarding one of Hartman's claims. This court added three more claims to the COA. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.   Factual background

In Hartman's direct appeal from his conviction, the Ohio Supreme Court set forth the following summary of the relevant facts:

Defendant met Winda Snipes at a bar in Akron, Ohio, sometime during 1997. Subsequently, they engaged in sexual intercourse on several occasions. During the late afternoon of September 9, 1997, defendant went to Snipes's apartment and brutally murdered her by tying her to the bed, stabbing her one hundred thirty-eight times, slitting her throat, and cutting off her hands.

Defendant was convicted of aggravated murder, kidnapping, and tampering with evidence, and sentenced to death. In order to establish defendant's guilt, the state introduced statements defendant had made to the police and to a fellow inmate in jail, and the testimony of a co-worker that defendant mentioned cutting off a victim's hands as a way to eliminate evidence in the O.J. Simpson case. The state also introduced as evidence defendant's bloody tee-shirt and Snipes's watch recovered from defendant's apartment, and forensic testimony linking defendant to the murder.

#### *State's case*

Around 2:20 a.m. on September 9, 1997, defendant met Snipes at the Bucket Shop, an Akron bar. Defendant kissed Snipes on the cheek and they talked. Thereafter, defendant and Snipes left the bar and they went to her apartment across the street.

Around 3:00 a.m., David Morris, an acquaintance of defendant and Snipes, left the Inn Between, another Akron bar. While walking past Snipes's apartment on his way home, Morris observed Snipes and defendant through the upstairs window of her apartment. Morris testified that Snipes was yelling at defendant about touching stuff that was not his. Defendant closed the window blinds and "obviously she wasn't very happy about it" because she "scolded" him and reopened the blinds.

That afternoon, at around 4:30 p.m., Snipes was observed crossing a street in a nearby business district. She was never seen alive again.

Defendant had the day off from work on September 9. According to Richard Russell, a bartender at the Inn Between, defendant entered the bar at around 8:00 p.m. and appeared nervous and hyper, and talked excessively. Thereafter, defendant was in and out of the bar five to six times between 9:00 and 10:30 p.m.

Defendant first contacted the police on September 9 with a series of anonymous 911 calls, which he later admitted to. His first 911 call at 9:59 p.m. reported the location of a mutilated body. The police officers dispatched to Snipes's address entered Snipes's apartment building and checked around, but left after finding nothing unusual. Meanwhile, defendant viewed the police unit's arrival and departure while hiding behind a tree across the street. Defendant then made another 911 call telling the police to return to the apartment building and provided further instructions on the body's location.

Akron police officers responding to this call entered Snipes's unlocked apartment and found her naked, mutilated body lying on the bedroom floor. Snipes's leg was draped across the bed, a pair of pantyhose tied her ankle to the bed leg, and a white

plastic chair was on top of her body. Snipes's hands were cut off and have never been found.

Around 10:45 p.m., defendant was at the Inn Between with Morris, while police units were across the street investigating Snipes's murder. Morris, having learned that Snipes had been murdered, suggested to defendant that he should talk to the police, since Morris had observed defendant at Snipes's apartment the previous evening.

Shortly before midnight, defendant approached Detective Gregory Harrison while he was at a mobile crime lab parked outside Snipes's apartment. Defendant walked up to Harrison and said, "I hear it's pretty bad in there," and asked if Harrison had "ever seen anything so gruesome." Later that evening, defendant approached Harrison a second time and spontaneously mentioned that Snipes was a whore, "that she slept around a lot," and that "he had slept with her * * * and he had even slept with her the night before at 3:00." In their final contact at around 3:00 a.m., defendant was "kind of mumbling to himself" and Harrison heard defendant say that "she was a whore, she was a big whore, she got what she deserved."

Between 11:30 p.m. and 12:15 a.m., defendant also approached Akron Police Lt. John A. Lawson near the murder scene and, "rather abruptly said, 'You're going to find my semen in her and my prints over there.'" When Lawson asked why, defendant said he "had been with her earlier that morning, the morning of the 9th," and that he had had sex with her.

At 12:15 a.m. on September 10, defendant spoke to Detective Joseph Urbank in front of the apartment building. Defendant began their conversation by announcing that "he had sex with the victim the night before." Moreover, defendant said he did not know her name but "only knew her as psycho bitch and that everybody knew that if you got drunk and were horny you went to go see her, you went to go see psycho bitch."

Defendant also told Urbank that he went to Snipes's apartment at 2:30 a.m. on September 9, and "she started dancing a little bit." He "lifted her onto the bed, undressed her," and "they started having vaginal intercourse." Defendant said that he was disappointed because Snipes refused to have anal intercourse, and he left her apartment around 3:30 a.m. However, defendant claimed that he did not know anything about the murder until the bartender at the Inn Between told him about it on the evening of September 9.

Around 6:00 a.m. on September 10, police took defendant to the Akron police station, where he was interviewed by Lawson and Urbank. During his interview, defendant denied making the 911 calls, and denied hiding behind a tree across from Snipes's apartment. Then, defendant changed a part of his story and admitted hiding behind a tree near the murder scene.

Following the September 10 police interview, the police searched defendant's apartment with his consent. The police seized defendant's bloody tee-shirt from underneath the headboard of his bed, a pair of his jeans, and his boots. Police found a knife on his dresser and Snipes's wristwatch on defendant's bed stand.

Police took defendant to the police station after the search of his apartment. While awaiting transfer to the Summit County Jail, defendant approached Detective John R. Gilbride and blurted out, "I was the one that called the police" and "I'm the one that found the body."

Defendant told Gilbride he had been sexually involved with Snipes since February 1997, and had sexual intercourse with Snipes during the early morning hours of September 9. Defendant stated that "after having sex the psycho bitch threw him out of the apartment stating that her boyfriend was coming over." He left around 3:30 a.m. and returned to his own apartment.

According to Gilbride, defendant said that he slept until 6:00 p.m. on September 9, and then took the bus to the Inn Between bar around 7:30 p.m. Gilbride testified that while going into the Inn Between bar, defendant noticed a light on in Snipes's apartment and decided to visit her. According to Gilbride, defendant gained entry to the apartment through an unlocked door and claimed that he found her dead body in her bedroom. Defendant said that he unsuccessfully tried to pick her body off the floor, noticed that her hands had been cut off, and "freaked out." Thinking "I'm going to get busted for this," defendant washed her blood off his hands and clothes, tried wiping down everything he touched, removed evidence linking him to her apartment, and went home.

Snipes was stabbed one hundred thirty-eight times. Bruising on her ankles indicated that she was alive when she was tied to the bed. Additionally, sperm was found in her vagina and anus. The medical examiner concluded that Snipes had died from strangulation and a slit throat either in the late afternoon or early evening of September 9.

Police found defendant's bloody fingerprint on the leg of the white chair draped over Snipes's body, and police found another of defendant's fingerprints on Snipes's bedspread. An expert witness testified that the long linear blood patterns found on defendant's tee-shirt and Snipes's bedspread were applied by a long-bladed knife. Further, the blood patterns found on defendant's tee-shirt were applied while the tee-shirt was lying flat, and not while defendant was wearing it.

At trial, the prosecution introduced a set of defendant's knives, including a meat cleaver, a knife, and a knife sharpener that defendant kept at the Quaker Square Hilton, where he worked as a chef.

Christopher Hoffman, a Hilton co-worker, testified that he talked to defendant in August 1997 about the O.J. Simpson trial. According to Hoffman, defendant said that Simpson could have disposed of evidence against him by cutting off the victim's hands and eliminating "fibers and hair and skin that might be found on the fingernails."

Bryan Tyson, a fellow inmate at the Summit County Jail, testified that during a jailhouse conversation, defendant admitted that he had killed Snipes. According to Tyson, defendant said that "he pushed himself on her, something in his mind snapped, she was hitting him, he lost his temper, did things he regretted, killed her." Then, defendant said that he had "tried to make it look like a burglary," admitted cutting off Snipes's hands, and mentioned a hacksaw, and jokingly said "'Don't leave home without it,' like the credit card commercial."

### Defense case

Jessica O'Neill, an acquaintance of defendant, talked on the phone with defendant on September 9. Phone records showed that O'Neill called defendant's apartment and spoke with him at 3:12 p.m. and 4:50 p.m. She also claimed that she talked with defendant on the phone around 6:30 or 7:00 p.m.

The defense also introduced evidence suggesting an alternative suspect, Jeff Nichols. Nichols lived across the hallway from Snipes's apartment until he moved out of his apartment around September 1, 1997. Nichols worked as a handyman for the apartment building and had access to the landlord's keys to other apartments.

In January 1997, Jeffrey Barnes, a friend of Snipes, was visiting Snipes's apartment when Nichols came to her door. According to Barnes, Nichols "got up right to her door and then he said, 'Slit the bitch's throat, cut her up,' and called her a slut and all other kind of vulgar names." Barnes reported this incident to the police upon hearing about Snipes's murder.

On an evening prior to September 1, 1997, Linda Zarski, a neighbor in Snipes's apartment building, heard Snipes pounding on Nichols's door and screaming that she wanted her shirt.

On another occasion prior to the murder, Linda Kinebrew, a neighbor living at the apartment, "heard [Nichols] arguing, telling [Snipes] to let him in and she wouldn't."

Carol Parcell, defendant's mother, provided an alibi. Defendant lived at his mother's apartment, and Parcell claimed that when she came home on September 9 at 6:15 p.m., her son was sleeping in his bedroom. According to Parcell, defendant woke up at 7:00 p.m., got ready, left the apartment at 7:30 p.m., and returned to the apartment around 8:15 p.m.

Defendant testified on his own behalf. He admitted having sex with Snipes several times over the past year and during the early morning hours of September 9 when he was at Snipes's apartment. After having sex, defendant returned to his apartment at about 3:30 a.m., slept until 6:15 p.m., left his apartment at 7:35 p.m., and returned to the Inn Between bar.

Before reaching the Inn Between, defendant noticed that Snipes's bathroom light was on at her apartment, and he decided to visit her to see if he could "get laid." Defendant entered Snipes's apartment through an unlocked door and found her mutilated body in the bedroom. Defendant tried to "get her up and put her on the bed * * * to see if there was anything else I could help with."

Defendant "freaked out" after noticing Snipes had no hands and realized he "could get in a lot of trouble" if he was placed at the scene. Thus, he washed her blood off his hands, wiped down the cupboards, chair handles, and anything else he might have touched, gathered whatever items he could find that belonged to him, and left Snipes's apartment. Defendant "ran home" and threw the items taken from Snipes's apartment into a nearby dumpster. Upon arriving home, defendant changed his shoes and hid the bloody tee-shirt so that his mother would not find it.

Thereafter, defendant hurried back to the Inn Between bar and started drinking. When he was "semi-intoxicated," defendant made the anonymous 911 calls reporting the location of Snipes's body, admitted standing behind a tree watching the police arrive at Snipes's apartment, and later approached the police to report that he had been at the apartment the previous evening.

Defendant introduced photographs taken of his naked body following his arrest to show the absence of bruises and injuries. Defendant explained that a cut on his elbow had occurred at work while he was moving crates.

Defendant acknowledged talking with Chris Hoffman about the O.J. Simpson case but did not recall discussing anything about cutting off a victim's hands.

Defendant knew Tyson as a fellow inmate but denied making any jailhouse admissions that he murdered Snipes.

### *Trial result*

The grand jury indicted defendant on two counts of aggravated murder, including one count of murder with prior calculation and design and one count of felony murder. A capital specification relating to murder during a kidnapping was included in the felony murder count. He was also charged with kidnapping and tampering with evidence.

The jury found defendant guilty of all offenses and recommended death for Snipes's murder. The trial court sentenced defendant to ten years for kidnapping, five years for tampering with evidence, and death for the aggravated murder of Snipes.

*State v. Hartman*, 754 N.E.2d 1150, 1158-61 (Ohio 2001). The Ohio Supreme Court affirmed Hartman's conviction and death sentence. *Id*. at 1183.

## B.    Subsequent case history

After the Ohio Supreme Court decided Hartman's direct appeal, he initiated state postconviction proceedings by setting forth 11 grounds for relief. The state trial court, however, denied his petition as to all of them. Hartman filed an appeal from the denial of his postconviction petition, but he missed the filing deadline. To excuse this procedural default, Hartman asserted that he did not receive timely notification that his postconviction petition had been denied, and that he filed his appeal diligently after receiving belated notification. Finding this excuse to be without merit, the Ohio Court of Appeals sua sponte dismissed Hartman's appeal as untimely. The Ohio Supreme Court then declined jurisdiction to hear his postconviction petition. It also denied Hartman's subsequent motion to reopen that was based, among other reasons, on the claim that his counsel had been constitutionally ineffective during the penalty phase of his trial.

After exhausting his state postconviction remedies, Hartman initiated federal habeas corpus proceedings pursuant to 28 U.S.C. § 2254 in January of 2003, again asserting 11 grounds for relief. He also argued that DNA testing was necessary because none had been performed during the course of his trial. Although he admitted having vaginal intercourse with Snipes on the morning of the murder, he denied having anal intercourse with her. He therefore asserted that DNA testing on the semen samples taken from the two cavities would exculpate him. The district court granted funds for the DNA testing. Unfortunately for Hartman, the tests ultimately showed that both samples matched his DNA.

In August of 2004, the district court denied Hartman's § 2254 petition in its entirety, but granted a certificate of appealability (COA) on the issue of whether sufficient evidence supported Hartman's kidnapping capital specification and separate kidnapping conviction. *Hartman v. Bagley*, 333 F. Supp. 2d 632 (N.D. Ohio 2004). This court expanded Hartman's COA by adding the issues of whether Hartman's counsel provided ineffective assistance at the mitigation phase, whether the trial judge gave improper "acquittal-first" jury instructions, and whether certain of the prosecutor's statements made during the penalty phase amounted to prosecutorial misconduct. We now address each of these four issues.

## II. ANALYSIS

### A. Standard of review and legal framework

"In a habeas corpus appeal, we review a district court's legal conclusions de novo, but will not set aside its factual findings unless they are clearly erroneous." *Dyer v. Bowlen*, 465 F.3d 280, 283-84 (6th Cir. 2006). The standard for reviewing for state-court determinations, by contrast, is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified at 28 U.S.C. § 2254(d). Under the AEDPA standard, a federal court

> may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . or (2) the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

*Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) (quotation marks omitted).

A state-court decision is considered "contrary to . . . clearly established federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (quotation marks omitted). Alternatively, to be deemed an "unreasonable application of . . . clearly established Federal law," a state-court decision on the merits must be "objectively unreasonable," not simply erroneous or incorrect. *Id*. at 409-11. Findings of fact made by the state court are presumed to be correct unless rebutted by "clear and convincing evidence." *Benge*, 474 F.3d at 241.

The AEDPA standard of review, however, applies only to "any claim that was adjudicated on the merits in State court proceedings." *Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006). Consequently, where a state court has not previously ruled on the merits of a claim, we apply the de novo standard of review. *Id.*

### B. Ineffective assistance of counsel during the penalty phase

The first COA issue is whether Hartman's defense counsel rendered ineffective assistance during the penalty phase of the trial. Hartman's claim encompasses his counsel's alleged failure to either fully investigate or adequately present mitigating evidence. This claim was not fully adjudicated on the merits in the Ohio courts, so we must also examine whether it has been procedurally defaulted.

#### 1. *Ohio court rulings*

Hartman did not present his ineffective-assistance claim on direct appeal. He fully presented the claim to the state trial court, however, during his postconviction proceedings. The trial court determined that res judicata barred the claim because Hartman had failed to raise it on direct appeal and "there was no proffer of evidence outside the record." To the contrary, our review of the record indicates that Hartman's claim of ineffective assistance of counsel was based primarily on a forensic psychology report that was, in fact, outside the record. As explained above, however, Hartman failed to timely appeal the state trial court's ruling. The Ohio Court of Appeals therefore sua sponte dismissed his appeal.

Hartman also raised a portion of his ineffective-assistance-of-counsel claim in his motion to reopen his direct appeal. In that motion, Hartman asserted that he had received ineffective assistance based on his counsel's allegedly inadequate presentation of mitigation evidence as well

as several other grounds not relevant to the present appeal. As to his mitigation-evidence claim, however, Hartman's motion asserted ineffectiveness only in relation to his counsel's alleged failure to adequately present evidence of his alcoholism. The Ohio Supreme Court entered a summary order denying Hartman's motion to reopen without explanation.

### 2. District court's ruling

In analyzing Hartman's federal habeas petition, the district court concluded that, based on the state-court procedural history set forth above, Hartman had procedurally defaulted all portions of his present claim not relating to his alleged alcoholism. *Hartman* 333 F. Supp. 2d at 671-72. Reviewing only that portion of Hartman's claim, the district court determined that Hartman's counsel was not ineffective. *Id.* at 674. The district court did not address, however, the effect of Hartman's efforts to raise the entirety of his claim in his state postconviction proceedings, including the Ohio trial court's determination that the claim was barred by res judicata and the Ohio Court of Appeals's sua sponte dismissal of his postconviction appeal.

### 3. Our review

This court applies a four-part test to determine whether a claim has been procedurally defaulted:

> (1) the court must determine that there is a state procedural rule with which the petitioner failed to comply; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) the state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error.

*Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). Reviewing Hartman's postconviction petition, the state trial court expressly relied on res judicata to determine that Hartman's claim was barred. "In Ohio, *res judicata* has long been held to bar consideration of constitutional claims in post-conviction proceedings brought under Ohio Rev. Code Ann. section 2953.21 when those claims have already been or could have been fully litigated either before judgment or on direct appeal from that judgment." *Id*. (citing *State v. Perry*, 226 N.E.2d 104, 105-06 (Ohio 1967)). A claim that relies on evidence outside the record, however, may be raised for the first time in postconviction proceedings if it could not have been brought on direct appeal based on the original record. *State v. Gibson*, 430 N.E.2d 954, 957 (Ohio Ct. App. 1980) (citing Ohio Rev. Code Ann. § 2953.21).

In the present case, a review of the record reveals that Hartman's ineffective-assistance claim is based primarily on evidence outside the record. He particularly relies on a forensic psychologist's report that identified specific mitigating considerations, but which was not introduced at trial. This court has held that Ohio's application of its res judicata rule generally constitutes an independent and adequate state ground that forecloses federal habeas review. *See, e.g.*, *Monzo*, 281 F.3d at 577. Nonetheless, this court has previously decided to review claims after determining that the "state court's reliance upon its own rule of procedural default [was] misplaced" because the claims were in fact based primarily on credible evidence outside the record and could not have been raised on direct appeal. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005) (quotation marks omitted); *see also Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005) (finding that the petitioner's ineffective-assistance claim was not barred under Ohio's default rule). Here, we similarly conclude that Hartman's postconviction ineffective-assistance claim is not procedurally barred. The

psychologist's report upon which Hartman principally relies was not part of the original trial record and the claim could not otherwise have been properly litigated on direct appeal.

Hartman faces a second barrier to our review of his ineffective-assistance claim, however, because he failed to timely appeal the state trial court's ruling that the majority of his claim was procedurally barred. He concedes that he filed his appeal over nine months after the judgment dismissing his petition was entered. Under Rule 4(A) of the Ohio Rules of Appellate Procedure, Hartman had 30 days from the date of entry to file a timely notice of appeal. Hartman does not contest that the Ohio Court of Appeals's dismissal of his postconviction appeal pursuant Rule 4(A) would ordinarily represent an independent and adequate state ground foreclosing review of his federal constitutional claim. He argues, however, that he can demonstrate cause and prejudice sufficient to overcome the default. *See Monzo*, 281 F.3d at 576.

To establish cause, Hartman must present a substantial reason that is external to himself and cannot be fairly attributed to him. *See Jamison v. Collins*, 291 F.3d 380, 386 (6th Cir. 2002) (holding that the prosecution's withholding of *Brady* evidence from the petitioner's attorneys qualified as a "substantial reason for the default that is external to [the petitioner]"). Hartman asserts in this regard that neither he nor his attorney ever received formal notice of the state trial court's order denying his petition. According to the docket, a copy of the order was sent only to Hartman, and not to his attorney. In support of his claimed nonreceipt, Hartman submitted an affidavit from a prison employee stating that no legal mail for Hartman was received during the relevant time period. The government raises no argument in response.

Hartman has thus established cause to excuse the procedural default resulting from his failure to timely appeal the denial of his postconviction petition. We will defer analyzing the related issue of prejudice until our evaluation of the merits of his claim, which is to be reviewed de novo because of the absence of a prior state adjudication on this issue. *See Joseph v. Coyle*, 469 F.3d 441, 462-63 (6th Cir. 2006) (concluding that a demonstration of prejudice under *Strickland* "likewise establishes prejudice for purposes of cause and prejudice" in the procedural-default context); *Danner*, 448 F.3d at 376 (applying the de novo standard of review to a claim not adjudicated on the merits by the state court).

Hartman's claim that he received ineffective assistance of counsel during the penalty phase of his trial centers on his counsel's alleged failure to investigate and present mitigating evidence based on a report from forensic psychologist Dr. James Siddall. Hartman concedes that his counsel performed some investigation. Counsel interviewed several members of Hartman's family, including his aunt, Arletta Hartman, and his half-sister, Rhea Wolpert; procured the services of Dr. Siddall; and arranged for Dr. Siddall to interview Hartman as well as his mother and aunt. In his final report, Dr. Siddall listed 10 mitigating factors that he had discovered in connection with Hartman's case. These factors include Hartman's family history of alcoholism, his unstable childhood involving frequent moves to different caretakers and new environments, his problems with hyperactivity, his instances of running away from home and living on the streets, his hospitalization for an alcohol overdose, his problems with drugs and alcohol throughout adolescence and early adulthood, and his recent purported stabilization shortly before the murder. The report also noted Hartman's claims that his step-father had physically abused him and his step-mother had sexually abused him. Dr. Siddall added, however, that these abuse claims were not corroborated by his interviews with family members.

In order to demonstrate ineffective assistance under *Strickland*, Hartman must show both that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Hartman claims that his counsel's performance was deficient because counsel did not enter Dr. Siddall's report into evidence and failed to further investigate or adequately present evidence regarding the factors listed in the report. The Warden

argues in response that Hartman's counsel made a strategic decision not to present the report itself, but instead to call family witnesses to testify regarding the mitigating circumstances identified in the report. Furthermore, the Warden asserts that any deficiencies did not prejudice Hartman because the allegedly significant evidence cited in the report would simply have been cumulative to the testimony and argument already presented. *See Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) ("[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.")

Outside of the jury's presence, Hartman's counsel explained to the court that "Dr. Siddall delineated, I think, ten separate mitigating factors and I think the family members will talk about virtually all of those in one way or another." He then called Hartman's half-sister and aunt to testify on Hartman's behalf during the penalty phase, and both described many of the factors listed in Dr. Siddall's report. They both testified about Hartman's chaotic upbringing that involved his parents' divorce and his frequent moves to different caretakers, his hyperactivity, his severe problems with drugs and alcohol at a young age, his alcohol-overdose incident, the alcoholism in his family, and his running away from home and living on the streets. The penalty-phase opening statement and summation presented by Hartman's counsel also emphasized these factors, as well as Hartman's age and his lack of adult felony convictions.

Nevertheless, the district court noted that counsel's overall presentation of mitigating evidence was "not exemplary and in certain respects may have fallen short of the ABA's standards," particularly given that it "encompasses only 41 pages of transcript." *Hartman*, 333 F. Supp. 2d at 672. Hartman points out that the first mitigation witness, his half-sister Rhea Wolpert, had lived with Hartman only until he was 5 years old, and then not again until he turned 17. In the interim, she learned of events in his life primarily through their mother. The other defense witness, Hartman's aunt Arletta Hartman, had taken care of Hartman for just three and one-half years during his adolescence. Moreover, Hartman argues that certain elements of Dr. Siddall's report—such as the "alcohol and substance abuse, addiction, and mental health issues"—were not adequately presented through the witnesses' testimony and required expert development. Neither witness was able to corroborate the abuse referenced in the report, and Wolpert specifically stated that Hartman's step-father had not been abusive, but simply "strict."

On the other hand, Hartman cites no specific failures or overlooked evidence sufficient to prejudice him under *Strickland*. The family testimony described above addressed most if not all of the factors listed in Dr. Siddall's report, albeit from a lay perspective. Furthermore, the decision not to introduce the report itself finds strategic justification. Although Dr. Siddall's report identifies mitigating factors and contains some sympathetic commentary, other aspects of it paint a decidedly unsympathetic portrait.

The report, for example, describes Hartman as an individual of "average intelligence," with "no evidence of psychotic symptoms" and "intact" organic brain function. Despite the report's description of Hartman's troubled childhood, it states that he "seemed to be stabilizing" prior to the murder. Such findings run contrary to the unstable or impaired mental functioning that a defendant would typically attempt to demonstrate by way of mitigation. *See, e.g.*, *Dickerson*, 453 F.3d at 698-99 (holding that counsel's failure to present mitigation evidence regarding the defendant's borderline-retarded intelligence constituted prejudice).

Hartman is diagnosed in the report with a mixed personality disorder typified by features of being "stubborn, self-centered, low in frustration tolerance, and often fail[ing] to conform to social norms with respect to lawful behaviors." Dr. Siddall further explained in the report that Hartman "portray[s] himself in a manner which is exceptionally free of common shortcomings to which other individuals will admit." Given that, prior to the murder, Hartman was generally able to conform his behavior to the law during his adult life in spite of this disorder, a jury might view the report's

portrayal of Hartman's personality deficits as simply off-putting rather than mitigating. Dr. Siddall himself in fact chose not to include Hartman's personality disorder in his list of "factors [that] are relevant to mitigation."

In light of these arguably unhelpful elements that are mixed in with the mitigating elements of the report, counsel might quite reasonably have made a strategic decision to present the report's mitigation findings through the more sympathetic lens of family members' testimony. Hartman counters that his counsel should have employed an alternate strategy of calling Dr. Siddall to testify in order to soften the impact of the report's "cold words." This alternate strategy, however, would simply carry a different set of risks. Moreover, Hartman's argument plainly invites us to second guess his counsel's strategic decisionmaking. Counsel's statements to the court that he had reviewed Dr. Siddall's report and planned to present the factors outlined therein through the testimony of family members invoke the oft-repeated directive that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *See Strickland*, 466 U.S. at 690.

Ultimately, no evidence cited by Hartman, either from Dr. Siddall's report or elsewhere, "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *See Hill*, 400 F.3d at 319. Hartman's habeas brief is instead replete with contentions that counsel failed to "expand on" or "corroborate[]" or "fully develop" the factors listed in Dr. Siddall's report. For example, Hartman asserts that counsel's mitigation investigation was inadequate because counsel "failed to obtain or present records from juvenile court or the juvenile detention facilities . . . [or from] child welfare agencies." Although the ABA standards indeed recommend obtaining such government records, Hartman argues that, if presented to the jury, the records would have simply "corroborated and detailed" the testimony actually presented. *See Dickerson v. Bagley*, 453 F.3d 690, 694 (6th Cir. 2006) (discussing the ABA guidelines for mitigation investigations).

These allegations typify Hartman's ineffective-assistance claim and distinguish it from the cases in which habeas relief has been granted. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 515 (2003) (holding that ineffective assistance occurred where counsel introduced "no evidence of [the defendant's] life history" despite existing evidence of brutal childhood abuse); *Hamblin v. Mitchell*, 354 F.3d 482, 485, 490 (6th Cir. 2003) (holding that counsel's assistance was ineffective because he "did nothing" in preparation and "did not present the jury with any mitigating evidence"); *Dickerson*, 453 F.3d at 698-99 (determining that prejudice arose from counsel's failure to investigate evidence of the defendant's borderline-retarded IQ and abusive childhood).

Confronted with this difficulty in his argument, Hartman contends that cumulative evidence must nonetheless be taken into account in the reweighing process that requires us to determine if there is a reasonable probability that, but for counsel's errors, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The necessary reweighing of evidence, however, is not evaluated simply in terms of volume. As this court has previously stated, "[o]ur cases reject a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective." *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005).

Hartman alternatively argues that he is entitled to a remand to the district court for an evidentiary hearing regarding whether his counsel's allegedly ineffective assistance in the penalty phase of the trial prejudiced him. He requested an evidentiary hearing in his initial state-court postconviction petition and before the district court below, but both courts denied his request. Assuming that he avoids the 28 U.S.C. § 2254(e)(2) bar, we nonetheless conclude that Hartman has not alleged sufficient facts to warrant an evidentiary hearing on this issue. The Supreme Court recently explained that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations,

which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007). Furthermore, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.*

In the present case, Hartman's allegations focus exclusively on the mitigating factors addressed in Dr. Siddall's report. As detailed above, his counsel's mitigation presentation addressed these factors, even if not to the extent that Hartman desires in retrospect. We therefore conclude that Hartman is not entitled to relief on his claim of ineffective assistance of counsel during the penalty phase of the trial.

## C.     The "acquit first" jury instruction

Hartman's second COA issue is whether the trial court erroneously instructed the jury that they must first unanimously "acquit" Hartman of the death penalty before considering possible life sentences. Prior to the jury beginning its deliberation in the penalty phase, the trial judge instructed the jurors as follows:

> If all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances . . . are sufficient to outweigh the mitigating factors, then you must return such finding to the court . . . .
>
> I instruct you, as a matter of law, that if you make such a finding, then you have no choice and must make a recommendation to the court that the sentence of death be imposed on the Defendant, Brett X. Hartman.
>
> . . .
>
> On the other hand, if after considering all of the evidence raised at trial which is relevant to the issues before you, the testimony, other evidence, and the arguments of counsel, you cannot unanimously agree that the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances, as I have defined them, outweigh the mitigating factors, then you'll return your recommendation reflecting your decision.
>
> In this event, you will then proceed to determine which of the three possible life imprisonment sentences to impose.

In addition, the judge informed the jury that "[w]hen all 12 of you, and I repeat, all 12 jurors agree upon a verdict, you will sign the verdict form in ink and advise the Court of this fact." The verdict forms themselves are addressed in greater detail below.

### 1.     *Ohio Supreme Court's ruling*

In evaluating this claim, the Ohio Supreme Court determined that, "[c]ontrary to the defendant's contention, the trial court never instructed the jury that it had to unanimously reject the death penalty before it could consider a life sentence." *Hartman*, 754 N.E.2d at 1171. The Court further explained that "[t]he instructions explicitly advised the jurors that if they were unable to unanimously agree to recommend death, they shall consider life sentences," and concluded that because "[t]he jury was . . . implicitly advised that a single juror could prevent the death penalty," the instruction was proper. *Id.*

### 2.    *District court's ruling*

The district court addressed this claim by comparing the state trial court's jury instructions to those deemed constitutionally sound in *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000). Characterizing the instructions in *Scott* as "virtually identical" to the instructions given here, the district court concluded that the instructions in question passed constitutional muster. *Hartman*, 333 F. Supp. 2d at 671. Furthermore, the court cited *Roe v. Baker*, 316 F.3d 557, 563 (6th Cir. 2002), as another case where this court "found no constitutional violation when the sentencing court failed to instruct the jury that unanimity was not required before the jury could consider a life sentence." *Hartman*, 333 F. Supp. 2d at 671. The district court noted, however, that this court's opinion in *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003), "gives support" to Hartman's argument, characterizing the instructions held unconstitutional in that case also as "substantially identical" to the instructions given by the trial court here. Nevertheless, the district court concluded that it was bound by the prior precedent of *Scott* and *Roe* because "a panel cannot overrule another panel." *Hartman*, 333 F. Supp. 2d at 671 n.16.

### 3.    *Our review*

Hartman argues that the Ohio Supreme Court's ruling on his claim does not warrant deference under AEDPA because the Court's ruling was so cursory as to preclude review of whether it reasonably applied federal law. The Warden does not address this argument. Although Hartman is correct that the Ohio Supreme Court failed to cite any federal law in support of its determination, the Court nevertheless articulated the governing legal standard that it applied to evaluate the instructions in this case. Furthermore, the Court relied extensively on its own prior holding in *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996), which did directly address the federal law cited by Hartman. *But see Danner*, 448 F.3d at 376 ("Any consideration of the [applicable federal law] contained within the state case law upon which the state courts relied is too attenuated to consider the [federal-law] claim to have been adjudicated on the merits"). Ultimately, we need not resolve this issue because, even reviewing Hartman's claim de novo, we agree with the Ohio Supreme Court's conclusion that the instructions were not improper.

An acquittal-first jury instruction is "[a]ny instruction requiring that a jury must first *unanimously* reject the death penalty before it can consider a life sentence." *Davis v. Mitchell*, 318 F.3d 682, 689 (6th Cir. 2003) (emphasis added). This court has held that such instructions are unconstitutional and provide grounds for habeas relief. *Id.* Under Ohio law, however, the jury must unanimously agree on the final sentence imposed, whether it be death or a term of life imprisonment. *See id.* Thus, even though the jury may not be required to unanimously "acquit" a defendant of death before considering life sentences, Ohio law requires that the jury be instructed that their ultimate sentencing decision must be unanimous.

Hartman urges that the instructions given in this case, although not explicitly erroneous, were ambiguous and subject to an unconstitutional interpretation. The Supreme Court has held that, in evaluating such an argument, the appropriate inquiry centers on "whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde v. California*, 494 U.S. 370, 380 (1990) (applying the "reasonable likelihood" examination to determine that an allegedly ambiguous jury instruction was not unconstitutional). Hartman urges that there is a reasonable likelihood that the jury misinterpreted the trial court's instructions as requiring unanimity at every stage of deliberation, including the question of whether the mitigating factors outweighed the aggravating circumstances.

We believe that the district court erred in determining that the instructions given in this case were substantially identical to those evaluated in *Davis* and *Scott*. (*Roe* did not specifically address instructions analogous to those at issue here.) The instructions in those cases and, more recently,

in *Spisak v. Mitchell*, 465 F.3d 684 (6th Cir. 2006), all began by explaining to the jury that "if all twelve members of the jury find . . . that the aggravating circumstances . . . outweighs [sic] the mitigating factors, . . . then you must recommend to the court that a sentence of death be imposed." *Id.* at 709; *see also Davis*, 318 F.3d at 684; *Scott*, 209 F.3d at 873. The trial court in the present case, to be sure, began with a similar instruction, informing the jury that their determination must be unanimous in order to recommend imposing the death penalty.

Where the instructions given by the trial court materially differ from those evaluated in *Davis*, *Scott*, and *Spisak*, however, is in the crucial portion just following the above-quoted instruction. In the prior cases cited, the state trial court's next instruction explained: "On the other hand, if after considering all of the relevant evidence . . . *you find that* the State failed to prove . . . that the aggravating circumstances . . . outweigh the mitigating factors, you will then proceed to determine which of [the] possible life imprisonment sentences to recommend." *Spisak*, 465 F.3d at 709-10 (emphasis added); *see also Davis*, 318 F.3d at 685; *Scott*, 209 F.3d at 873.

The state trial court in *Davis* added: "[T]hat is, you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors." 318 F.3d at 685 (emphasis omitted). In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), the state trial court gave substantially identical instructions, but then went a step further by adding: "That is, you must *unanimously* find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors." *Id.* at 416 (emphasis added).

This court in *Davis* held that the above-quoted language ambiguously instructed the jury what to do in the event that "you find" that the state failed to prove that the aggravating circumstances outweighed the mitigating factors because the instruction did not specify whether that "finding" needed to be unanimous. *Davis*, 318 F.3d at 690. The courts in *Davis* and *Spisak* went on to examine the totality of the jury instructions given and concluded that there was a reasonable likelihood that the jury would have filled in this instructional void by drawing from other sources that required unanimity, such as the verdict forms or, as in *Davis*, the general instruction given in "close proximity" that "since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement." *Davis*, 318 F.3d at 684.

Here, the trial court's instructions left no such void. After instructing the jurors as stated above regarding what to do in the event that all 12 agreed that the aggravating circumstances outweighed the mitigating factors, the court explained: "On the other hand, if after considering all of the evidence . . . *you cannot unanimously agree* that the State . . . proved beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors, then you'll return your recommendation reflecting your decision. *In this event, you will then proceed to determine which of the three possible life imprisonment sentences to impose*." (Emphasis added.)

The above instructions correctly and explicitly state that anything short of unanimous agreement regarding whether the aggravating circumstances outweigh the mitigating factors required the jury to proceed to determine which possible life sentence to impose. Notably, the court did not employ the "if . . . you find" or "you must find" language used in cases like *Davis* and *Spisak*, but instead instructed the jurors, first, what to do if they *did* unanimously find that the aggravating circumstances outweighed the mitigating factors, and then, second, what to do if they could *not unanimously* so find. These instructions are therefore readily distinguishable from those held to be susceptible to an unconstitutional acquittal-first interpretation in *Davis* and *Spisak*.

Relying on this court's holding in *Davis*, Hartman further asserts that the jury verdict forms used by the Ohio trial court permitted an unconstitutional interpretation. He argues that the forms

could be interpreted to erroneously indicate that a life verdict may be rendered only if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating factors. The death-sentence verdict form used in Hartman's case was in fact similar to those used in prior cases. It provided, in pertinent part, that "[w]e the jury . . . *do find* . . . that the aggravating circumstances outweigh the mitigating factors . . . . We, the jury, recommend the sentence of death be imposed . . . ." (Emphasis added.) *Compare Spisak*, 465 F.3d at 710; *Scott*, 209 F.3d at 873-74. All 12 jurors were required to sign the form.

The central point argued by Hartman, however, concerns the life-sentence verdict forms. In prior cases analyzed by this court, Ohio's life-sentence verdict forms provided that "we the jury . . . *do find* that the aggravating circumstances . . . are not sufficient to outweigh the mitigating factors present," and required the signatures of all 12 jurors. *Spisak*, 465 F.3d at 710 (emphasis added); *Davis*, 318 F.3d at 690; *Scott*, 209 F.3d at 874. In both *Davis* and *Spisak*, the court concluded that this wording contributed to the potential misunderstanding that unanimity was required in order to consider life sentences.

The verdict forms used in Hartman's trial differed from those used in other recent death-penalty cases that this court has reviewed. Although the death-sentence verdict forms were the same, the life-sentence verdict forms provided that "we the jury . . . *do not find*, by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors." (Emphasis added.) Again, all 12 jurors were required to sign the form. The difference in the life-sentence verdict forms used in this case is significant. Whereas both the life-sentence and death-sentence verdict forms in prior cases expressed a finding and required the signature of all jurors, only in Hartman's case did the life-sentence verdict forms profess a *nonfinding* regarding whether the aggravating circumstances outweighed the mitigating factors. This wording conforms to the trial court's earlier proper instructions that, essentially, anything short of a unanimous agreement that the aggravating circumstances outweighed the mitigating factors necessitated a life sentence. In *Goff v. Bagley*, No. 1:02-cv-307, 2006 WL 3590369, at *10 (S.D. Ohio Dec. 1, 2006), the Southern District of Ohio recently reached a similar conclusion in analyzing a life-sentence verdict form substantially identical to the ones employed in Hartman's case.

This court in *Williams v. Anderson*, 460 F.3d 789, 811-13 (6th Cir. 2006), attempted to resolve in dicta what the district court in this case perceived to be the tension among this court's holdings regarding acquittal-first jury instructions. We have no occasion to comment on that analysis here, however, because we conclude that the trial court's instructions in this case differed materially from prior alleged "acquittal-first" instructions and did not create a reasonable likelihood that the jury applied them in an unconstitutional manner.

## D.     Prosecutorial misconduct

Hartman's third COA issue asserts that the prosecutor's alleged implication during the penalty phase of the trial that the murder itself could be considered as an aggravating circumstance amounted to prosecutorial misconduct and violated Hartman's constitutional rights. He specifically highlights four instances of alleged misconduct during the penalty phase in which the prosecutor stated:

1.     The kidnapping is certainly the fact that Winda Snipes was restrained during the aggravated murder. She was tortured and the kidnapping encompasses torture, serious physical harm as well as the restraint. Okay?

2.     And I submit to you you can consider the binding of her ankles to the bed, cord ligature around her neck, in excess of 130 stab wounds of [sic] cuts of different sorts to her body, some of which you learned from the Medical

examiner was [sic] before she was dead, terrorize, inflict serious physical harm. You can certainly consider those things.

3.    I think you can certainly consider as part of the aggravating circumstance this Defendant's actions after the murder, removing of evidence, trying to wipe down the scene, letting the mutilated body of Winda Snipes lay for several hours before –
Mr. Whitney: Objection, objection.
Court:       Overruled.
Mr. Bandy:   – the police are called, fleeing after the commission of a crime. Those kinds of actions can also be considered by you.

4.    You think about the aggravating circumstance and I want you to think about it, take each one – everything that Attorney Bandy went over in regard to the kidnapping: Winda Snipes was restrained, she was terrorized, over 130 stab wounds, her throat was slit, her hands were removed, think about that aggravating circumstance.

Hartman agues that the prosecutor's references to facts pertaining to the murder itself were improper in the course of discussing the aggravating circumstances.

### 1.    Ohio Supreme Court's ruling

The Ohio Supreme Court considered only the third statement of alleged prosecutorial misconduct that Hartman now highlights. *Hartman*, 754 N.E.2d at 1173. In reference to that statement, the Court agreed that "it was wholly improper for the state to argue or suggest that the jury may consider the nature and circumstances of the offense as 'part of the aggravating circumstances.'" *Id.* Nevertheless, the Court concluded that the alleged misconduct did not prejudicially affect Hartman's substantial rights for two reasons: (1) the statement "could not have made any difference in the outcome" in light of the jury's finding of guilt regarding the aggravating circumstance of kidnapping and the "lack of compelling mitigating evidence," and (2) the trial court's clear and proper instruction to the jury that kidnapping was the only aggravating circumstance in the case. *Id.* at 1173-74.

### 2.    District court's ruling

In reviewing Hartman's prosecutorial-misconduct claim, the district court specifically addressed only the fourth statement listed. The court agreed that the statement was improper, and added that it found "deeply troubling the prosecutor's references to the gruesome nature of the crime and the post-mortem mutilation of the body." *Hartman*, 333 F. Supp. 2d at 664 & n.13. Characterizing the statement as "a passing remark" and "limited in nature," however, the court concluded that it did not render the penalty-phase proceeding "fundamentally unfair." *Id.* at 664. Moreover, the district court determined that the trial court properly instructed the jury as to the aggravating circumstance of kidnapping, and that Hartman had failed to overcome the presumption that the jury would follow the court's instruction. *Id.*

### 3.    Our review

The district court correctly noted that Hartman preserved his prosecutorial-misconduct claim for review by raising it before the Ohio Supreme Court. Of the four allegedly improper statements Hartman points to, we agree with the Ohio Supreme Court and the district court that the third and fourth statements were improper. As explained below with respect to Hartman's fourth COA claim, however, his alleged restraint, "torture," and "terroriz[ing]" of Snipes are central to establishing a necessary element of the kidnapping in this case: that Hartman's restraint of Snipes led to a

substantial increase in the risk of physical harm to which she was exposed separate from that associated with her murder. The prosecutor's first and second statements simply detail this serious harm separate from that associated with the murder to which Snipes was subjected by virtue of her restraint. Such "serious physical harm" is a statutory component of kidnapping, the sole aggravating circumstance charged against Hartman. *See* Ohio Rev. Code Ann. § 2905.01 (defining kidnapping as the asportation or restraint of another for the purpose of, among other things, "terroriz[ing], or . . . inflict[ing] serious physical harm on the victim"). For this reason, the prosecutor's first and second statements were not misleading.

By contrast, the third and fourth statements improperly encouraged the jury to take into account the means of killing—the slitting of Snipes' throat—and the post-mortem mutilation of Snipes's body as aggravating circumstances. But such isolated remarks generally do not rise to the level of a due process violation. In order to warrant habeas relief, Hartman must show that

> the statements of the prosecutor so infected the trial with unfairness as to make the resulting conviction a denial of due process. In order to deny due process, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant.

*Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations and quotation marks omitted).

The two statements in question do not fit this description. Moreover, as both the Ohio Supreme Court and the district court noted, the trial court properly instructed the jury to consider only the kidnapping as an aggravating circumstance of the murder. We presume that the jury followed these instructions "unless there is an 'overwhelming probability' that they were ignored." *See Scott*, 209 F.3d at 879 (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)).

In the case before us, the jury convicted Hartman of the separate kidnapping offense, and the mitigation evidence was relatively weak. These factors substantially undermine Hartman's attempt to rebut the presumption that the jury obeyed the court's instruction to weigh only the kidnapping circumstance against the mitigating factors. The Ohio Supreme Court's conclusion that the prosecutor's closing argument did not violate Hartman's rights, therefore, was not contrary to or an unreasonable application of clearly established federal law.

### E.        Sufficiency of the kidnapping evidence

Hartman's fourth and final COA issue asserts that insufficient evidence supported the jury's conclusion that he was guilty of the kidnapping capital specification and the separate kidnapping charge. Specifically, he claims that the evidence was insufficient to establish either the standard elements of kidnapping or the additional element that the kidnapping was motivated by an animus separate from that which motivated the murder. This additional element was required in the present case both under Ohio law and under the Eighth Amendment principle that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *See Zant v. Stephens*, 462 U.S. 862, 877 (1983). If not required to be motivated by a separate animus from the murder itself, a kidnapping capital specification would presumptively fail to genuinely narrow the class of murder defendants eligible for the death penalty. *See id.*

#### 1.        *Ohio Supreme Court's ruling*

The Ohio Supreme Court determined that the prosecutor had introduced proof that one of Snipes's legs had been tied to the bed, and had shown that this restraint was effected while she was

alive.  *Hartman*, 754 N.E.2d at 1162.  Regarding the separate animus requirement, the Court stated that

> the test to determine whether the kidnapping was committed with a separate animus so as to support a separate conviction is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense.

*Id.* (quotation marks omitted).  Applying this test, the Court concluded:  "The evidence therefore shows that Snipes's kidnapping, *i.e.*, the restraint, was completed prior to her murder and that the restraint was not merely incidental to her murder."  *Id.*

Justice Pfeifer dissented on this issue.  He opined that, although "[i]t is possible to believe that a kidnapping occurred," the record did not establish the kidnapping beyond a reasonable doubt because "the alleged kidnapping was in reality a series of actions that were incidental to the crime of murder."  *Id*. at 1183 (Pfeifer, J. dissenting).

### 2.    *District court's ruling*

The district court deemed Hartman's kidnapping claim to be his "best argument for habeas relief," *Hartman*, 333 F. Supp. 2d at 666, but ultimately concluded that "[a] reasonable juror could well find that Hartman's restraint of Winda Snipes was motivated by a different animus than the animus motivating the murder."  *Id*. at 669.  Reviewing Ohio law, the district court concluded that two questions were significant for determining the existence of a separate animus: "(1) was the restraint prolonged, the confinement secretive, or the movement substantial to show a significance independent of the other offense, and (2) did the asportation or restraint of the victim subject the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime?"  *Id*.

The district court's analysis focused on the second prong in determining that the tying of Snipes's leg to the bed exposed her to a substantial increase in the risk of harm separate from that involved in the murder.   First, the court noted that tying Snipes's leg "substantially increased her risk of harm of assault and rape."  *Id*.  Second, the court held that the restraint in question "only marginally increased  her risk of the type of murder she suffered—strangulation and a slit throat." The court based this latter conclusion, in part, on the coroner's testimony that Snipes died quickly after her throat was slit.  *Id*.  Were the restraint intended to facilitate this form of murder, the court reasoned, Hartman would have restrained Snipes's upper extremities as well in light of the forensic evidence demonstrating that she struggled with her arms.  *Id*. at 669 n.15.  Furthermore, the court determined that "Snipes' small size, only 5 feet, 2 inches tall with a weight of 128 pounds, suggests that binding her to the bed was neither necessary to carry out the murder nor likely associated with the murder."  *Id*. at 669 (citation omitted).

### 3.    *Our review*

Hartman preserved this claim for habeas review by raising it in his direct appeal.  As a result, the Ohio Supreme Court's determination that the evidence was sufficient to support the kidnapping capital specification and separate kidnapping conviction must be upheld unless it is contrary to, or an unreasonable application of, clearly established federal law.  Evidence is constitutionally sufficient if, when viewed in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

As the Ohio Supreme Court and the district court concluded, the evidence that Hartman restrained Snipes by forcibly tying one of her legs to the bed for some period of time while she was

alive sufficed to establish the standard elements of kidnapping. Consequently, we turn to the central issue of whether the evidence was constitutionally sufficient to support a finding that Hartman possessed an animus to commit the kidnapping that was separate and apart from that motivating the underlying murder.

The "separate animus" requirement under Ohio law does not demand that a defendant possess an animus to kidnap exclusive of an animus to commit other crimes; instead, it simply requires that the kidnapping animus exist separately. *See State v. Logan*, 397 N.E.2d 1345, 1351-52 (Ohio 1979) (framing the primary issue in determining the existence of a separate kidnapping animus as whether "the restraint or movement of the victim" has "significance independent of the other offense"). Evidence of substantial movement of the victim, for example, can satisfy the separate-animus requirement even if the perpetrator may have ultimately intended to commit additional crimes against the victim. *See State v. Jells*, 559 N.E.2d 464, 475 (Ohio 1990) (finding that the evidence supported a separate kidnapping animus where the defendant kidnapped a victim by forcing her and her son into a van and driving off, and then murdered her by beating her to death either during the course of the drive or after arriving at a junkyard). Similarly, a separate animus has been found where the defendant restrains the victim in order to facilitate inflicting substantial harm separate and apart from that associated with murder (such as terrorizing or torturing a victim), even if the defendant may have ultimately intended to murder the victim. *See State v. Seiber*, 564 N.E.2d 408, 420 (Ohio 1990) (finding that the evidence supported a separate animus for kidnapping based on a substantially increased risk of harm where the defendant threatened and terrorized various bar patrons before finally murdering one of them). The kidnapping in both *Jells* and *Seiber* was not merely incidental to the murder; instead, the restraint was found to have a separate purpose that genuinely distinguished it from the restraint typically inherent in the crime of murder.

In the present case, Snipes was found with one leg bound by pantyhose to the bed and a gag over her mouth. According to the medical examiner, Snipes had been bound while she was still alive. The medical examiner's report stated that, in addition to numerous nonfatal stab wounds, Snipes suffered significant blunt-force trauma to her face and eyes, indicating a beating. (Although the Ohio Supreme Court and the district court speculated as to whether Snipes had been raped based on the semen discovered in Snipes's body, Hartman accurately points out that the medical examiner found no evidence of forced entry. Combined with the admitted consensual relationship between Hartman and Snipes, the evidence does not clearly establish that a rape occurred or that the restraint facilitated a rape.)

In spite of the clear evidence that Snipes was restrained, Justice Pfeifer dissented from the Ohio Supreme Court's majority opinion and concluded that the increased-risk-of-harm factor of the separate-animus inquiry was not sufficiently established. His conclusion, however, appears to derive primarily from his expansive interpretation of the harm involved in the underlying crime of murder. He states that "the alleged kidnapping was in reality a series of actions that were incidental to the crime of murder." *Hartman*, 754 N.E.2d at 1183 (Pfeifer, J., dissenting). If the harm involved in the underlying crime of murder is confined to acts that purposefully cause the death of another, however, the separate, extraordinary harms to which Snipes was subject by virtue of her restraint establish a separate kidnapping animus. The disagreement among the justices thus centered on whether inflicting beatings and numerous patently nonlethal stab wounds amounted to harm "separate and apart" from that associated with the murder.

We believe that the district court's focus both on Snipes's diminutive size compared with Hartman's and on the rapidity of her death following the slitting of her throat resolve the debate in favor of the Ohio Supreme Court's majority opinion. *See Hartman*, 333 F. Supp. 2d at 669. There is little reason to believe that Hartman needed to restrain Snipes in order to inflict the harm associated with her murder, but strong reason to conclude that the restraint was intended to facilitate the infliction of the additional nonlethal harms apparent from the forensic evidence. *Cf. State v.*

*Adams*, 817 N.E.2d 29, 51 (Ohio 2004) (finding no separate animus where the victim had not been bound or restrained in any way other than what was "necessary" to commit the underlying offenses).

Based on the evidence presented, we conclude that a reasonable juror could find beyond a reasonable doubt that Hartman's restraint of Snipes subjected her to an increased risk of the harm associated with being beaten and terrorized that was separate and apart from the harm involved in being murdered. Had the much-larger Hartman intended solely to murder Snipes, there is no reason to believe that the leg restraint and gag would have been necessary. The Ohio Supreme Court's determination that sufficient evidence supported a finding that Hartman possessed a separate animus to kidnap Snipes was therefore not contrary to or an unreasonable application of clearly established federal law. *See Jackson*, 443 U.S. at 319.

**F.     Ineffective assistance of former habeas counsel**

In addition to the issues listed in the COA, Hartman attempts to raise in this appeal the issue of the allegedly ineffective assistance of his former habeas counsel. Hartman previously sought a COA regarding this claim, but both the district court and this court denied that request. This court also denied his petition to rehear that particular COA request en banc. Because the COA granted for this appeal covers only the issues set forth above, and because we have previously determined that Hartman's claim regarding his former habeas counsel is without merit, we decline to further address it here.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. With the exception of Parts II.B and II.C, I join in the majority's well-reasoned opinion. With respect to Petitioner's claim of ineffective assistance of counsel at the sentencing phase, I concur in the majority's analysis of procedural default and its conclusion that Petitioner established cause to excuse the procedural default. However, I respectfully dissent from the majority opinion inasmuch as it denies Petitioner's ineffective assistance of counsel claim on the merits. In my view, Petitioner's counsel performed ineffectively at the sentencing phase, thereby violating Petitioner's Sixth Amendment Right to Counsel. Correspondingly, I believe Petitioner has shown prejudice to excuse procedural default of this claim. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (a petitioner must show cause and prejudice to obtain federal habeas relief on a procedurally defaulted claim); *Joseph v. Coyle*, 469 F.3d 441, 462-63 (6th Cir. 2006) ("[E]stablishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice."). On the matter of acquittal-first jury instructions, I also dissent on the belief that the Ohio Supreme Court's decision runs contrary to clearly established Supreme Court precedent on jury instructions in capital cases. I would therefore vacate Petitioner's death sentence and remand for a new sentencing phase trial.

Like the majority, I would review Petitioner's ineffective assistance claim *de novo* because the Ohio state courts failed to adjudicate this claim on the merits. *See Wiggins v. Smith*, 539 U.S. 510, 528-31 (2003); *McKenzie v. Smith*, 326 F.3d 721, 726-27 (6th Cir. 2003); *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). Petitioner contends that trial counsel "fail[ed] to thoroughly investigate his background and mental health history for potential mitigating evidence," and failed to present sufficient evidence in mitigation. (Pet.'s Br. at 11, 13)[1] Reviewing this claim *de novo*, I would grant Petitioner habeas relief.

In an appendix to his Petition to Vacate, Petitioner attached a May 13, 1998 evaluation of Petitioner conducted by a clinical and forensic psychologist, James W. Siddall, Ph.D., wherein Dr. Siddall identified "potential mitigating circumstances pursuant to Ohio Revised Code [§] 2929.04(B)." (J.A. at 1332) The Siddall Report set forth Petitioner's social history, including instability in his living situation, adjustment problems at home and at school, physical abuse at the hands of a step-father, alleged sexual abuse at the hands of a step-mother, the death of his father in 1994, a history of substance abuse and alcoholism, and time as a runaway living homeless on the streets. Moreover, the Siddall Report assessed Petitioner's mental status and personality, concluding that Petitioner suffered from "a mixed personality disorder with obsessive-compulsive, narcissistic, and antisocial features." (*Id*. at 1337) It went on to characterize individuals with mixed personality disorder as typically "stubborn, self-centered, low in frustration tolerance, and fail[ing] to conform to social norms," (*id.*) and noted that "[u]nder the influence of disinhibiting substances, episodes of irritability, hostility, aggression, and loss of control may be observed." (*Id*. at 1338)

---

[1]Petitioner also challenges counsel's effectiveness inasmuch as counsel conceded in his opening statement "there was nothing they could do to reduce the blame for this crime," counsel failed to object to the prosecutor's improper arguments, and counsel failed to object to the state's use of certain victim impact evidence. However, this Court granted Petitioner's COA on a more limited scope, certifying the question whether counsel performed ineffectively "by not conducting a sufficient investigation into mitigating factors and not presenting significant evidence during the sentencing phase." (Order at 2 (Aug. 10, 2005)) Accordingly, claims of ineffective assistance on these alternative bases are not before this Court. *See Bugh v. Mitchell*, 329 F.3d 496, 502 n.1 (6th Cir. 2003) (citing *Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001)).

Petitioner's trial counsel did not call Dr. Siddall to testify in the penalty phase, nor did he introduce the Siddall Report into evidence. Instead, the entire case in mitigation consisted of testimony from Petitioner's sister, Rhea Wolpert ("Ms. Wolpert"), and aunt, Arletta Hartman ("Ms. Hartman").[2] Their testimony largely tracked the mitigating factors contained in the Siddall Report. Ms. Wolpert spoke about Petitioner's difficulty adjusting as a child, his unstable family situation, his time as a runaway, his involvement with drugs and alcohol, and his family's history of alcoholism. She testified that while Petitioner lived with her, he got himself a job, "was a hard worker," and helped contribute (both financially and in terms of house work) to the household, but that even then she noticed his problems with alcohol. (J.A. at 708-09) Ms. Wolpert further stated that, in her experience, Petitioner had only "a little" difficulty with authority and was "[n]o[] more [rebellious] than any other child." (*Id.* at 711-12)

Ms. Hartman testified that she agreed to care for Petitioner when he was eight because Petitioner was experiencing "discipline problems and problems with his stepfather" at home. (J.A. at 724) She indicated that Petitioner behaved hyperactively and had some difficulty adjusting both socially and academically at first, and that later he grew rebellious, lying and stealing apparently so Ms. Hartman would send him back to his mother. Ms. Hartman additionally reported on Petitioner's episodes as a runaway, his involvement in theft, and his time served in a juvenile detention center. Further, she testified to his theft of a car, his apparent selling of drugs, alcoholism, and two additional stays in California group homes. Finally, Ms. Hartman testified that Petitioner took action to make amends with his father and step-mother, voluntarily turned himself in to the California group home that he had improperly left at an earlier time, and – while at the group home – earned his GED and got a job. As stated previously, the testimony of Ms. Wolpert and Ms. Hartman constitutes the entirety of the case Petitioner's counsel put forth in mitigation. Critically, Petitioner's counsel proffered no evidence of physical abuse by Petitioner's step-father or of sexual abuse by Petitioner's step-mother, and insufficient evidence of genetic alcoholism for the trial judge to allow reference to it in Petitioner's 'Exhibit U.'[3] (*Id.* at 751-52)

Defendant must show both (1) deficient performance of counsel; and (2) that counsel's deficient performance prejudiced the defense, thereby rendering the trial fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel performs deficiently where his "representation f[a]ll[s] below an objective standard of reasonableness." *Id.* at 688. Objectively reasonable representation is properly measured with reference to "prevailing professional norms" and the inquiry takes into account all circumstances at the time of the conduct. *Id.* at 688-89. Appellate courts review counsel's performance with great deference. To satisfy the second prong of the inquiry, a "defendant [must] affirmatively prove prejudice" by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. The probability need only be so great as to "undermine confidence in the outcome." *Id.* at 694. Failure to satisfy either prong of the inquiry is dispositive.

In my view, trial counsel failed to provide objectively reasonable representation at the mitigation phase. *See Strickland*, 466 U.S. at 688. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

---

[2] As the majority acknowledges, Ms. Wolpert, who is eleven years older than Petitioner, moved away from home when Petitioner was merely five years old. Until Petitioner's late teens, when he lived with Ms. Wolpert for a few years, Petitioner had little contact with Ms. Wolpert. As a result, almost the entire body of Ms. Wolpert's testimony came not from first-hand knowledge of Petitioner's life and activities, but from stories relayed to her by their mother. Ms. Hartman lived with and cared for Petitioner for a similarly brief period of time (three and one-half years).

[3] Exhibit U was a chart prepared by Petitioner's counsel setting forth mitigating factors that initially included the step-father's abusiveness and genetic alcoholism. In response to Respondent's objection to the exhibit's admissibility, the trial judge required Petitioner to redact references to both the physical abuse and alcoholism.

*Id*. at 691. Accordingly, we must consider "whether counsel conducted a reasonable investigation of Defendant's background." *Spisak v. Mitchell*, 465 F.3d 684, 707 (6th Cir. 2006). As an aid "to determining what is reasonable," courts have looked to the American Bar Association Guidelines. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing *Wiggins*, 539 U.S. at 524). The ABA Standards for Criminal Justice provide that:

> [t]he lawyer . . . has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to the fulfillment of these functions.

1 ABA Standards for Criminal Justice 4-4.1 (1982 Supp.).

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Trial counsel apparently possessed at least some of Petitioner's mental health records and his criminal records. Beyond that, the record reflects that trial counsel's mitigation phase investigation involved consultation with Dr. Siddall, and discussions with Ms. Wolpert and Ms. Hartman. Dr. Siddall evaluated Petitioner and prepared a report to assist counsel in identifying potential mitigating factors for presentation at the sentencing phase. Dr. Siddall interviewed Petitioner personally and administered several psychological and personality assessment tests. Although the Siddall Report identified several pathways for further investigation, it does not appear that trial counsel pursued those paths.

Rather, from the record before us, it appears that trial counsel unreasonably limited his investigation, all but foreclosing consideration of three potential mitigating factors. First, the Siddall Report clearly identified genetic alcoholism as a factor in mitigation. Ms. Wolpert proffered vague testimony about her family's history of alcoholism and Petitioner's personal struggles with alcohol abuse, as did Ms. Hartman.[4] Not surprisingly, the trial judge found this testimony insufficient to establish genetic alcoholism and, accordingly, redacted that mitigating factor from an exhibit prepared by Petitioner's counsel to guide the jury's deliberations. Consistent with the ABA Guidelines,

> [r]ecords should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help . . . underscore the hereditary nature of a particular impairment.

*Hamblin v. Mitchell*, 354 F.3d 482, 487 n.2, 488 (6th Cir. 2003) (quoting ABA Guidelines for the Appointment & Performance of Def. Counsel in Death Penalty Cases ¶ 10.7, at 80-83 (2003)) (citing the "2003 ABA Guidelines . . . because they are the clearest exposition of counsel's duties at the penalty phase . . . , duties that were recognized by this court as applicable to the 1982 trial of the

---

[4] Notably, when asked about Petitioner's drinking, Ms. Wolpert responded, "He was involved a little bit." (J.A. at 709) Counsel's exploration of genetic alcoholism consisted of two questions: first, "there's alcoholism in your family; is that correct;" and second, "[Petitioner] has been around alcoholics and alcohol all of his life, if you're aware of that?" (*Id*. at 712) In each case, Ms. Wolpert gave brief, lukewarm affirmative answers. Ms. Hartman's testimony recounted an episode where Petitioner was hospitalized as an adolescent following a "chuck-a-lucking" contest. (*Id*. at 738)

defendant in *Glenn v. Tate*"). A "reasonably competent attorney" would have pursued stronger evidence of genetic alcoholism. *See Wiggins*, 539 U.S. at 534.

Second, according to the Siddall Report, Petitioner suffered physical abuse at the hands of his step-father, and sexual abuse at the hands of his step-mother. As the majority indicates, Petitioner's claims of physical and sexual abuse were not corroborated by Petitioner's family members during interviews with Dr. Siddall. Yet, Dr. Siddall's investigation was not exactly searching itself. In fact, the report indicates that Dr. Siddall relied on background information summarizing Petitioner's "criminal justice involvement, mental health treatment, and the circumstances of the instant offense," two meetings with Petitioner himself, and telephone interviews with Petitioner's mother and Ms. Hartman. (J.A. at 1332) The fact that Petitioner's mother and Ms. Hartman did not corroborate Petitioner's claims of childhood abuse does not unequivocally mean that trial counsel, upon investigation, would find *no* record of abuse.[5] On the basis of this very small body of evidence, when coupled with the often secretive treatment of abuse, a reasonably competent attorney could not simply conclude "that further investigation would have been fruitless." *See Wiggins*, 539 U.S. at 525. To the extent that Dr. Siddall partially attributed Petitioner's personality disorder to "instability and abuse in his home environment," (*id.* at 1338), trial counsel had even greater reason to investigate the alleged instances of abuse.

Third, Dr. Siddall concluded that Petitioner suffered from mixed personality disorder – a condition that, when combined with "disinhibiting substances," can lead to "episodes of irritability, hostility, aggression, and loss of control." (J.A. at 1338) As the Report reflects, Dr. Siddall further concluded that instability and abuse at home contributed to Petitioner's mixed personality disorder. In my view, Dr. Siddall's conclusion would prompt a reasonable attorney to investigate more fully Petitioner's mental and emotional stability over time, for example, by requesting his school records, records from juvenile detention facilities and group homes, or from any medical professionals or counselors. On the record before us, it appears that trial counsel did not conduct additional investigation into the development and existence of a personality disorder. "Our Court's precedents . . . make clear that conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*'s requirements." *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006).

Aside from his insufficient investigation, trial counsel failed to introduce evidence within his control. Specifically, counsel failed to introduce evidence of Dr. Siddall's conclusion that Petitioner suffered from "a mixed personality disorder with obsessive-compulsive, narcissistic, and antisocial features" which left him prone to "episodes of irritability, hostility, aggression, and loss of control" when under the influence. (*See* J.A. at 1337-38) Dr. Siddall's report additionally indicated that Petitioner's mixed personality disorder and propensity to substance abuse were "compounded by instability and abuse in his home environment." (*Id.* at 1339). What is more, the Siddall Report raises the implication that counsel had in his possession some evidence of abuse. The Report quotes the findings of psychologists at the New Mexico Youth Diagnostic and Development Center that Petitioner "'presented symptoms characteristic of children who had been abused including poor self-esteem, difficulty with authority, and rebellious behavior.'" (*Id.* at 1339) These findings apparently came from the mental health records in trial counsel's possession which, of course, counsel did not introduce at the sentencing phase of Petitioner's trial.

The majority finds that Petitioner's trial counsel likely made strategic choices in presenting Petitioner's case in mitigation "through the more sympathetic lens of family members' testimony," and in omitting reference to less helpful portions of the Siddall Report. I do not disagree that, by presenting mitigating evidence through Ms. Wolpert and Ms. Hartman, trial counsel humanized

---

[5] In fact, the Siddall Report suggests that mental health records apparently in counsel's possession described Petitioner as presenting "symptoms characteristic of children who had been abused." (J.A. at 1339)

Petitioner in a way that Dr. Siddall's testimony could not. Yet, by confining the case in mitigation to their testimony, trial counsel similarly limited the evidence of genetic alcoholism and abuse put before the jury. In doing so, counsel did not foreclose reference to less sympathetic elements of Petitioner's background and history, since counsel himself elicited such testimony on direct examination of Ms. Wolpert and Ms. Hartman. *Cf. Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (counsel not ineffective where limited mitigation case was designed to foreclose rebuttal evidence of petitioner's prior convictions); *Clark v. Mitchell*, 425 F.3d 270, 286 n.6 (6th Cir. 2005) (finding counsel's representation not deficient, in part, because it was likely that "counsel made a strategic decision to limit testimony about [the petitioner's] past in order to prevent 'opening-the-door' to evidence of [his] criminal background"). Ms. Wolpert readily described Petitioner's efforts to work hard and contribute to the household while he lived with her, and testified that Petitioner had only "a little" difficulty with authority as a child. (J.A. at 711-12) Similarly, Ms. Hartman testified that Petitioner had taken steps to mend his relationship with his father and step-mother, to make good at the California group home from which he previously absconded, and to earn his GED and hold down a job. In my view, the contention that counsel made strategic choices to shape this case in mitigation "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *See Wiggins*, 539 U.S. at 526-27 (emphasis in original). At any rate, "virtually unchallengeable" strategic choices follow "*thorough investigation* of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690 (emphasis added). Absent *thorough investigation* of plausible leads, I would not find that Petitioner's trial counsel performed effectively.

Although not dispositive, the numbers in this case paint a compelling picture. Dr. Siddall's report identified ten potential mitigating factors. Trial counsel received the report a mere *five* days before Petitioner's mitigation hearing began. At the hearing, counsel put forth the testimony of two witnesses, and admitted one summary exhibit into evidence. The entirety of Petitioner's case in mitigation spans approximately 40 pages of transcript. Trial counsel's closing argument covered a total of ten pages in the transcript, culminating in "a two and a half page story about the ancient Greek philosopher and orator Aeschylus, the conclusion of which was counsel telling the jury 'the answer is in your hand.'" (Pet.'s Br. at 21 n.9; *see also* J.A. at 774) Qualitatively and quantitatively, trial counsel's performance fell below "prevailing professional norms." *See Strickland*, 466 U.S. at 688-89.

Additionally, Petitioner must show he suffered prejudice as a result of trial counsel's deficient performance. Petitioner need only show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94. The probability need only be so great as to "undermine confidence in the outcome." *Id.* at 694. "In assessing prejudice, [this Court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 529 U.S. at 534. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Ultimately, "the 'prejudice' prong is satisfied if 'there is a reasonable probability that at least one juror would have struck a different balance.'" *Hamblin*, 354 F.3d at 493.

On appeal, Petitioner relies on counsel's failure to introduce the Siddall Report – or to have Dr. Siddall testify – to show prejudice. Either through the report itself or through questioning Dr. Siddall, counsel could have elicited testimony on Petitioner's personality disorder, the way his social and familial history likely contributed to the disorder, and the way the disorder (coupled with his alcoholism) rendered him incapable of controlling his impulses. This, of course, is critically important inasmuch as impulse control bears on Petitioner's culpability. *Cf. California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (noting that a "defendant[] who commit[s] criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"). In fact, the Ohio death

penalty statute makes "mental disease or defect" a mitigating factor. *See* Ohio Rev. Code § 2929.04(B)(3).[6] Thus, had the jury known of Petitioner's apparent personality disorder, and had counsel investigated and adduced evidence of genetic alcoholism and abuse, "there is a reasonable probability that at least one juror would have struck a different balance," finding Petitioner less culpable and sentencing him to life in prison, not death. *See Wiggins*, 539 U.S. at 537; *see also Williams*, 529 U.S. at 395-98 (finding prejudice from counsel's failure to investigate and introduce evidence which "might well have influenced the jury's appraisal of his moral culpability").

Moreover, "Petitioner . . . has the kind of troubled history . . . relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Through Dr. Siddall's report, or his testimony, the jury would have received a more comprehensive understanding of Petitioner's social history. Trial counsel's limited examination of Ms. Wolpert – Petitioner's much older and distant sister – and Ms. Hartman did not sufficiently explore Petitioner's "troubled history" of abuse, alcoholism, and (briefly) homelessness. *See Carter v. Bell*, 218 F.3d 581, 596-97 (6th Cir. 2000) (failure to investigate unstable childhood and history of violence); *Greer v. Mitchell*, 264 F.3d 663, 678 (6th Cir. 2001) (counsel knew of and failed to investigate family history of alcoholism, violence, foster care, and incarceration); *cf. Smith v. Mitchell*, 348 F.3d 177, 204 (6th Cir. 2003) (finding no prejudice where "trial counsel presented five witnesses at mitigation, and its principal witness . . . presented a comprehensive picture of [the petitioner's] family, social, psychological background, based upon extensive review of '[n]umerous sources of information,' which included not only psychological tests, but also interviews, hospital records, school reports, and social services records").

Dr. Siddall's testimony on these mitigating factors would differ both "in strength and subject matter . . . from the evidence actually presented at sentencing." *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). The record here reflects that trial counsel put forth insufficient evidence of genetic alcoholism, and no evidence of physical and sexual abuse. *Cf. Smith*, 348 F.3d at 200 (finding no prejudice where "virtually all of the mitigating elements that [the petitioner] complain[ed] of were presented via [the mitigation expert's] testimony and her mitigation report"); *Hill*, 400 F.3d at 317 (finding evidence cumulative where "most of the information" to be conveyed "was included in the nine psychological reports submitted in the penalty and mitigation phases"). Therefore, stronger evidence of genetic alcoholism, or any evidence of abuse, put forth either through Dr. Siddall's testimony or more in depth examination of Ms. Wolpert and Ms. Hartman would not be "merely cumulative," and could thus support a finding of prejudice. *Cf. Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006) ("[F]ailure to present additional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation."). Finally, above and beyond the evidence at counsel's disposal, a thorough investigation of the mitigating factors identified by Dr. Siddall would likely have revealed further evidence of genetic alcoholism or abuse. Thus, Petitioner's trial counsel rendered ineffective assistance, falling short of the requirements of the Sixth Amendment.

I also disagree with the majority's conclusion on Petitioner's acquittal-first jury instruction claim. The Ohio Supreme Court did consider this claim on the merits albeit, as the majority acknowledges, without reference to federal law. Accordingly, for purposes of this dissent, I limit my review in accordance with the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d); *cf. Wiggins*, 539 U.S. at 529-31; *McKenzie*, 326 F.3d at 726-27; *Clinkscale*, 375 F.3d at 436; *but see Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (reviewing *de novo* where the state court considered petitioner's federal constitutional claim on the merits under state law).

---

[6]The statute directs the fact finder to consider "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." Ohio Rev. Code § 2929.04(B)(3).

Since the Ohio Supreme Court did not *apply* clearly established federal law, the relevant inquiry is whether their decision runs "contrary to . . . clearly established [Supreme Court] precedent." *Williams*, 529 U.S. at 405-06. Thus, the gravamen of this Court's review must be whether the Ohio Supreme Court's decision is "diametrically different, opposite in character or nature, or mutually opposed" to that precedent. *Id.* at 406 (internal quotation marks omitted). In my view, the Ohio Supreme Court's decision on this claim runs contrary to clearly established Supreme Court precedent – specifically, *Mills v. Maryland*, 486 U.S. 367 (1988), and our Circuit precedent in *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003) and *Spisak v. Mitchell*, 465 F.3d 684 (6th Cir. 2006), cases which bear on the inquiry inasmuch as they inform the analysis of acquittal-first jury instructions under *Mills*.

Pursuant to clearly established Supreme Court precedent, the Eighth and Fourteenth Amendments require individualized consideration of relevant mitigating factors before a state may impose a penalty of death. *Lockett v. Ohio*, 438 U.S. 586, 606 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The holding in *Mills* follows from *Lockett* and *Eddings*. *Mills* holds that a defendant's rights under the Eighth and Fourteenth Amendments are violated if

> there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in th[e] case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.

*Mills*, 486 U.S. at 384. Applying *Mills*, the Supreme Court subsequently concluded that unanimity requirements in capital sentencing schemes "prevent[] the jury from considering . . . any mitigating factor that the jury does not unanimously find" prior to imposing a sentence of death and therefore violate the Eighth and Fourteenth Amendments. *McKoy v. North Carolina*, 494 U.S. 433, 435 (1990).

From *Mills* flows a line of cases in our Circuit examining so-called "acquittal-first" jury instructions.[7] As the majority observes, acquittal-first jury instructions encompass "[a]ny instruction requiring that a jury must first unanimously reject the death penalty *before it can consider* a life sentence." *Davis*, 318 F.3d at 689 (emphasis added). Acquittal-first instructions implicate the Eighth and Fourteenth Amendment inasmuch as they create a substantial probability that the jury will impermissibly require unanimity as to mitigating factors. This not only constitutes a misapplication of Ohio law, but also spuriously tips the scale in favor of death. Under *Davis*, an acquittal-first instruction "precludes the individual juror from giving effect to mitigating evidence and runs afoul of *Mills*." *Davis*, 318 F.3d at 689; *see also Spisak*, 465 F.3d at 709.

The jury instructions here very clearly constitute acquittal-first jury instructions. They differ only slightly from the jury instructions in *Davis* and *Spisak*, and in ways even more constitutionally questionable. The trial courts in *Davis* and *Spisak* framed the issue as follows: "[I]f . . . *you find that the State failed to prove* beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors, . . . you will *then proceed* to determine which of [the] possible life imprisonment sentences to recommend." *Davis*, 318 F.3d at 685 (alterations added and omitted);

---

[7] These cases also followed the Ohio Supreme Court's decision applying *Mills* in *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996). Several cases in this line consider the issue only in dicta, having found the challenges to the jury instructions procedurally defaulted. *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000) being one of them, I would not consider this Court bound to follow it. Further, as the majority acknowledges, *Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002) concerned jury instructions dissimilar to those now at hand.

*see also Spisak*, 465 F.3d at 709-10.  Here, the trial court employed slightly different language:[8] "[I]f . . . *you cannot unanimously agree that [the State] proved* beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors, . . . you will *then proceed* to determine which of three possible life imprisonment sentences to impose."  (J.A. at 787-88)  Although the words chosen for the jury instructions vary between *Davis* and *Spisak* on one hand and Petitioner's case on the other, the meaning and effect of the instructions does not.  If anything, the jury instruction in Petitioner's case poses an even greater threat of misleading the jury because it reiterates that the jury must act "unanimously."[9]

Additionally, the trial court's verdict form substantially mirrors the verdict forms in *Davis* and *Spisak*, further compounding the risk of misleading the jury.  What is more, the trial judge here dismissed the jury to deliberate with the direction to return a verdict "[w]henever all 12 of you, and I repeat, all 12 jurors agree."  (J.A. at 793)  Taken together, the inappropriate acquittal-first jury instructions, the verdict form, and the trial judge's statement upon dismissing the jury for deliberations raise a reasonable likelihood that the jury applied the instructions in Petitioner's case in such a way as to preclude giving effect to mitigating factors unless unanimously found, thereby violating Petitioner's rights under the Eighth and Fourteenth Amendments.  Accordingly, in my view, the Ohio Supreme Court's decision runs contrary to the U.S. Supreme Court's clearly established precedent in *Mills*.

Thus, because the trial court gave unconstitutional acquittal-first jury instructions, and because Petitioner's counsel rendered ineffective assistance at the sentencing phase, I would vacate Petitioner's sentence and remand for a new sentencing phase trial.

---

[8]At greater length, Petitioner's penalty phase jury instructions read, in pertinent part, as follows:

If all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances, as I have defined them, are sufficient to outweigh the mitigating factors, then you must return such finding to the Court.

I instruct you, as a matter of law, that if you make such finding, then you have no choice and must make a recommendation to the Court that the sentence of death be imposed on the Defendant [].

. . .

On the other hand, *if* after considering all of the evidence raised at trial which is relevant to the issues before you, the testimony, other evidence, and the arguments of counsel, *you cannot unanimously agree that the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances*, as I have defined them, *outweigh the mitigating factors, then you'll return your recommendation reflecting your decision.*

In this event, you will *then proceed* to determine which of the three possible life imprisonment sentences to impose. . . .

(J.A. at 786-88) (emphasis added)

[9]More subtly, and perhaps a point more suitably explored by psychologists, the instruction at hand asks the jury to consider what the "State proved," and not what it "*failed*" to prove."  The former, it seems, establishes a threshold presumption that the State, in fact, proved its case.